In re BOSTON REGIONAL MEDICAL CENTER, INC., Debtor.

Boston Regional Medical Center, Inc., Plaintiff,

v.

Hanson S. Reynolds and Gary Douglas Rose, in their capacities as Co–Trustees of the Elizabeth Krauss Revocable Trust, the Elizabeth Krauss Charitable Remainder Annuity Trust, and the Elizabeth Krauss 1998 Charitable Remainder Annuity Trust, and The Attorney General of the Commonwealth of Massachusetts, Defendants,

and

First Lutheran Church and the First Church of Christ, Scientist, Interveners.

Bankruptcy No. 99–10860–CJK.
Adversary No. 00–1390.

United States Bankruptcy Court, D. Massachusetts.

Aug. 14, 2003.

Charles R. Bennet, Jr., Kathleen R. Downing, Boston, MA, for Plaintiff.

Robert B. Foster, Boston, MA, for Reynolds.

Lawrence K. McCarthy, Roxbury, MA, for Rose.

Deirdre Rosenberg, Johanna Soris, Boston, MA, for Attorney General of Comm. of MA.

Michael G. Gilleran, Boston, MA, for Interpleader First Lutheran Church.

Theodore E. Dinsmoor, William V. Sopp, Boston, MA, for Interpleader The First Church of Christ, Scientist.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

CAROL J. KENNER, Bankruptcy Judge.

The principal issue presented by this adversary proceeding is whether, under Massachusetts law, a debtor charitable corporation that has permanently discontinued its charitable operations (in this case, the provision of medical services) and entered liquidation proceedings nonetheless remains qualified to receive a bequest intended for charitable purposes, where the bequest would be used to pay debts incurred earlier, in furtherance of the corporation's charitable mission. The Court concludes that the debtor corporation remains qualified to receive the bequest.

Elizabeth Krauss died on March 1, 1998, leaving to the Debtor, Boston Regional Medical Center, Inc. ("BRMC" or "the Debtor") through three testamentary trusts, a one-third interest in the residue of each trust. BRMC filed its petition under Chapter 11 of the Bankruptcy Code on February 4, 1999, and discontinued hospital operations within a few days thereafter. By its amended complaint in this adversary proceeding, the Debtor, acting through its liquidating agent and pursuant to its confirmed Chapter 11 plan, seeks an order directing Hanson S. Reynolds and Gary Douglas Rose, as co-trustees of the three trusts ("the Co–Trustees") to turnover to BRMC the funds representing its one-third interest in the residue of each trust.[1] In their answers, the Co–Trustees state that they have no position on whether BRMC is entitled to a distribution from the trusts. The other two residuary legatees/beneficiaries, The First Lutheran Church of Boston ("First Lutheran") and The First Church of Christ, Scientist ("the Christian Science Church"), as Interveners herein, oppose the request for turnover, taking the position that BRMC, by virtue of its financial difficulties and ultimate discontinuance of hospital operations, has, before the date of distribution, become unable to use the funds for a charitable purpose. First Lutheran has also filed a counterclaim against BRMC and the Co–Trustees[2] of the three

---

1. The Debtor also seeks accountings from the Trustees of the trusts' receipts and disbursements from the date of Elizabeth Krauss's death. The Court understands that the Trustees have already provided such accountings.

2. Although First Lutheran Church refers to its claims against the Co–Trustees as counterclaims, they are in fact cross-claims, because the Co–Trustees have not asserted claims against First Lutheran Church.

Trusts, asking that the testamentary provisions of the Trusts be reformed to require that the bequest to BRMC be used "to provide a bed for indigent patients" as was required by the will that the Trusts replaced and purportedly followed, and for a determination that BRMC cannot receive the bequest as so modified because it can no longer provide a bed for indigent patients. The Court, having determined that it has jurisdiction only to enter proposed findings of fact and conclusions of law, now enters and submits the following proposed findings and conclusions to the District Court in accordance with 28 U.S.C. § 157(c)(1) and F.R.BANKR.P. 9033. For the reasons set forth below. the Court concludes that judgment should enter for BRMC on both the complaint and the counterclaim.

## PROCEDURAL HISTORY

BRMC is a Massachusetts charitable corporation that, at all relevant times through the date of its bankruptcy filing, operated as an acute care hospital in Stoneham, Massachusetts. BRMC filed a petition under Chapter 11 of the Bankruptcy Code on February 4, 1999. Within days thereafter, it ceased providing medical care. In its bankruptcy case, BRMC later proposed and this Court confirmed a Joint Liquidating Plan of Reorganization

pursuant to which all property of the bankruptcy estate was revested in BRMC[3] and is to be liquidated for the benefit of creditors.

Elizabeth Krauss died on March 1, 1998, eleven months before BRMC's bankruptcy filing. Before her death, her court-appointed guardians, acting pursuant to authority obtained from the Massachusetts Probate Court, had transferred her assets into three trusts: the Elizabeth Krauss Revocable Trust ("the Revocable Trust"), the Elizabeth Krauss Charitable Remainder Annuity Trust ("the 1997 Charitable Trust"), and the Elizabeth Krauss 1998 Charitable Remainder Annuity Trust ("the 1998 Charitable Trust"). Each trust contained testamentary provisions under which, upon the death of Ms. Krauss, the trustees were to distribute the residue of each trust in equal shares to three charitable organizations: BRMC, First Lutheran, and the Christian Science Church. When Ms. Krauss died, the value of the Trusts' residues totaled approximately $3.6 million. Even before February 4, 1999, the date of the Debtor's bankruptcy filing, the Co–Trustees of the three trusts made partial distributions to First Lutheran and the Christian Science Church; no distribution has yet been made to BRMC, but the Co–Trustees have set aside in escrow an equal

---

3. The reorganized BRMC remains a Massachusetts not-for-profit corporation and is governed by a three-person board of trustees whose members are appointed by the Creditors Committee in this case. Joint Liquidating Plan of Reorganization, Article 5.3(a). This board in turn selects a "Liquidating Agent," who serves as president, treasurer, and clerk of BRMC and is charged with conducting an orderly liquidation of the plan assets, distributing the proceeds to creditors in accordance with the plan, and otherwise implementing the terms of the plan. Id., Article 5.4. When the Liquidating Agent has completed the liquidation process and made the final distribution to creditors, BRMC will be deemed dissolved. Confirmation Order, p.

13, ¶ 26. Any surplus remaining after payment in full of all allowed claims and administrative costs shall be transferred to the Southern New England Conference of Seventh Day Adventists (of which BRMC was an affiliate), provided it is qualified as a charitable organization under the Internal Revenue Code and the Massachusetts General Laws. Joint Liquidating Plan of Reorganization, Article 5.8. However, it is clear in this case that the assets available for distribution will be insufficient to pay all allowed claims and administrative expenses in full; there is no possibility of a surplus being remitted to the Southern New England Conference of Seventh Day Adventists.

share to that received by the others, pending final resolution of this adversary proceeding.

Disconcertingly and without explanation, BRMC was given no notice that it might be entitled to a distribution from the three trusts until over two years after Ms. Krauss's death and sixteen months after the commencement of this bankruptcy case. Approximately fifteen months after BRMC filed its bankruptcy petition, one or both Interveners filed suit in the Massachusetts Probate Court, challenging and seeking a determination of BRMC's rights under the Trusts, but the Interveners failed first to seek relief in this Court from the automatic stay, or from the equivalent injunction in the Debtor's confirmed liquidating plan and in the order confirming it.[4] The Interveners have failed to offer any satisfactory explanation for this. On June 16, 2000, after commencing the action, First Lutheran moved belatedly in the bankruptcy court for relief from the automatic stay to prosecute the action and to join BRMC as a party therein, but BRMC objected. The Court denied the motion, in effect requiring that the matter be adjudicated in the Bankruptcy Court.

Then, on August 17, 2000, BRMC filed the complaint commencing this adversary proceeding. The complaint, as amended, names three defendants: Hanson S. Reynolds and Gary Douglas Rose, in their capacities as co-trustees of the Revocable Trust, the 1997 Charitable Trust, and the 1998 Charitable Trust, and the Attorney General of the Commonwealth of Massachusetts. As against the Co–Trustees, the complaint states two counts: one for turnover of BRMC's one-third interest in the residue of each trust, and one for an accounting of the receipts and disbursements of each trust from the date of Ms. Krauss's death. The complaint seeks no relief against the Attorney General; he was joined by order of the Court, the Court having determined that he was a necessary party because the complaint seeks a determination as to the disposition of a gift to a public charity, and because the Interveners argue (in part) that the gift is subject to the equitable doctrine of cy pres. In separate answers, the Co–Trustees have stated that they are stake-holders only and have no position on whether BRMC qualifies for a distribution under each of the trusts. The Attorney General filed an answer to the amended complaint but has taken no position on the issues and has not otherwise participated in this adversary proceeding.

First Lutheran and the Christian Science Church moved to intervene in the adversary proceeding, and their motion was allowed.[5] As Interveners, they filed

---

4. The plan and the order confirming it, entered January 18, 2000, vested the property of the estate in the Debtor but provided for continuation of the automatic stay as to such property and expressly enjoined commencement of any action with respect to property of the estate.

5. The First Lutheran Church and The First Church of Christ, Scientist, have been permitted to intervene as to BRMC's complaint in order to defend their interests. With respect to one of the three trusts, the Elizabeth Krauss Revocable Trust, those interests appear to be fixed and clear: if the gift to one of

the three residuary beneficiaries should fail, that gift would, by operation of the trust, devolve in equal parts to those that remain. With respect to the other trusts, the Charitable Remainder Annuity Trusts, the Interveners' "interests" are more in the nature of expectancies than fixed and certain rights. According to the language of both trusts, as set forth in the complaint and in the Interveners' own recitations of fact, if a charitable organization that is specified to receive a distribution under the trust is not still a qualifying charitable organization at the time when any principal or income of the trust is to be distributed to it then the trustees shall distrib-

answers to the amended complaint, taking the position that BRMC is not entitled to distributions from the Trusts because it can no longer use the distributions for the charitable purposes for which they were intended and therefore no longer qualifies as a charitable beneficiary under the three Trusts.

Later, and with leave of Court, First Lutheran filed a counterclaim in which the Christian Science Church has since joined. The counterclaim is asserted against BRMC and against the Co–Trustees of the three Trusts. It asks that the bequest to BRMC in each of the three Trusts be declared a nullity because it fails to require that the bequest be used "to provide a bed for indigent patients," as was required by the will of Elizabeth Krauss that the Trusts replaced and purportedly followed; and, in the alternative, the counterclaim asks that the Court (1) reform the bequests in the Trusts to incorporate the omitted requirement and (2) determine that BRMC cannot receive the bequest as so reformed because it can no longer provide a bed for indigent patients. BRMC answered the counterclaim, stating that it should be denied on its merits and interposing the affirmative defense of res judicata. Hanson Reynolds, as Co–Trustee of the three Trusts, also answered the counterclaim, stating that it should be denied on its merits and interposing the affirmative defense of res judicata. The other Co–Trustee, Gary Douglas Rose, has filed no answer to the counterclaim.

Before moving for leave to file a counterclaim, First Lutheran moved to dismiss the amended complaint for lack of subject-matter jurisdiction, and the Christian Science Church moved that the Court abstain under 28 U.S.C. § 1334(c)(1) from adjudicating the complaint. In support of both motions, the Interveners contended that this adversary proceeding is not a "core proceeding" within the meaning of 28 U.S.C. § 157(b), and, therefore, that the Bankruptcy Court does not have authority, without the consent of the parties, to finally adjudicate the complaint. Neither Intervener consents to this Court's entering final judgment on the complaint, but both concede that the adversary proceeding is at least "related to a case under title 11 [the Bankruptcy Code]" within the meaning of 28 U.S.C. § 157(a) and (c) and that, if this is not a core proceeding, the Court may hear the matter and make proposed findings of fact and conclusions of law with respect to the matter, subject to review de novo by the District Court. See 28 U.S.C. § 157(c)(1) and F.R.Bankr.P. 9033. Nonetheless, the Interveners contended that,

ute such principal and income to whatever qualifying charitable organizations the trustees select in their discretion, taking into account the wishes of the donor, Ms. Krauss, as best they can be ascertained. In short, the Interveners would have no automatic right to the funds intended for Boston Regional Medical Center. The right to designate a substitute beneficiary of the assets in these two trusts is entirely the Trustees'. The Interveners expect that they would be named as substitute beneficiaries—they state that one of the Co–Trustees has so assured them—but I am not aware that any designation has yet been made. Presumably, the Trustees could, within their rights, name other organizations as substitute beneficiaries.

In allowing their motion to intervene with respect to these two trusts, the Court in essence ruled that the Interveners' expectancies give them sufficient interest to allow them to intervene and oppose the Debtor's complaint. However, that ruling should not be construed as a determination that the Interveners may or should be named as substitute beneficiaries. In this adversary proceeding, the Court will determine only the validity of the Debtor's interests in the trusts. If the Court were to determine that the gifts to the Debtor fail, the Court could make no ruling on the alternate disposition of the funds. That disposition would have no effect on this bankruptcy case whatsoever and therefore would fall entirely outside of this Court's jurisdiction.

for reasons of comity with the state courts and judicial economy, the Court should reject this option and simply abstain. In response, BRMC argued that the matter is a core proceeding but also that, if the matter is non-core, the court should retain jurisdiction to make proposed findings and conclusions.

The Court observed that the complaint involved at least two distinct parts: a claim for enforcement of the Debtor's alleged right to a distribution of funds in certain trusts in which the estate claims to have equitable interests (though not yet legal title) that arose prepetition; and a request to determine the validity and extent of such prepetition interests and rights to distribution. For reasons set forth in a memorandum of decision on those motions (published at 265 B.R. 645, and issued on August 20, 2001), which memorandum I hereby incorporate by reference into these proposed findings and rulings, the Court ruled as follows:

1. that the first of these parts (the claim for enforcement of a right to a distribution) might be deemed a "turnover" proceeding, which as such would be a core proceeding, see 28 U.S.C. § 157(b)(2)(E) (core proceedings include motions for orders to turn over property of the estate), but

2. that the latter part (for a determination of the validity and extent of the estate's prepetition interests and rights) is clearly not a turnover action and not otherwise a core proceeding;

3. that lacking the Interveners' consent, the Court may not finally adjudicate BRMC's request for a determination of the validity and extent of the estate's prepetition interests and rights;

4. that the complaint is "related to" the bankruptcy case within the meaning of the bankruptcy jurisdiction statutes, 28 U.S.C. §§ 1334(b) and 157(a) and (c)(1);

5. that, under 28 U.S.C. § 157(c)(1) and in accordance with F.R.Bankr.P. 9033, this Court may and will hear the matter and submit proposed findings of fact and conclusions of law to the District Court, subject to review de novo of those matters to which the parties timely and specifically object; and

6. that the motions to dismiss and to abstain should be and were denied.

Because the motions to dismiss and to abstain were filed before First Lutheran filed its counterclaim, these rulings pertained only to the amended complaint. The Court will rule on its jurisdiction over the counterclaim below.

BRMC filed a motion for summary judgment, but the Court denied the motion without addressing its merits, stating only that the matter should be resolved on a fully-developed record. A one-day trial was held on February 7, 2003, at which the parties submitted documents into evidence, mostly by agreement, and the Court heard the testimony of four witnesses: Hanson Reynold, Susan Coppola, Phong Dinh, and John Foster. The parties have filed post-trial briefs.

### JURISDICTION

The Court determined the extent and nature of its jurisdiction over BRMC's amended complaint in a separate memorandum of decision, issued August 20, 2001, that has been incorporated by reference into these findings and rulings; the conclusions from that memorandum are summarized above and need not be reiterated here. However, the earlier memorandum did not address the Court's jurisdiction over the counterclaim, and the

Court must do so now. 28 U.S.C. § 157(b)(3) (bankruptcy judge shall, on her own motion, determine whether a proceeding is a core proceeding or is a proceeding that is otherwise related to a case under title 11).

■ The counterclaim is jurisdictionally identical in all material respects to BRMC's request for a determination of the validity and extent of its interests in the Trusts. The counterclaim is not a core proceeding, but, because it will affect—by augmenting or diminishing—the estate being administered in bankruptcy, it is "related to" the bankruptcy case within the meaning of 28 U.S.C. §§ 1334(b) and 157(a) and (c)(1).[6] The Interveners have not consented to the Court's entering final judgment as to the counterclaim. Therefore, this Court may not determine and enter final judgment on the counterclaim. 28 U.S.C. § 157(c). Nonetheless, under 28 U.S.C. § 157(c)(1) and in accordance with F.R.BANKR.P. 9033, this Court may and will hear the matter and submit proposed findings of fact and conclusions of law to the District Court, subject to review de novo of those matters to which the parties timely and specifically object. 28 U.S.C. § 157(c)(1).[7]

---

**6.** Under the widely accepted test, a proceeding is "related to" a bankruptcy case within the meaning of 28 U.S.C. § 1334 and 157, the bankruptcy jurisdiction statutes, if its outcome "could conceivably have any effect on the estate being administered in bankruptcy." *In re Hall's Motor Transit Co.*, 889 F.2d 520 (3rd Cir.1989), citing *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir.1984) (interpreting the phrase as it appeared in (now repealed) 28 U.S.C. § 1471(b)).

**7.** Section 157(c)(1) states:
A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and

---

**PROPOSED FINDINGS OF FACT**

The Court hereby makes the following findings of fact and submits them to the District Court as proposed findings.

1. The Plaintiff and Debtor, Boston Regional Medical Center, Inc., was incorporated as a not-for-profit corporation in Massachusetts in 1899 under the name New England Sanitarium and Benevolent Association. On January 18, 1995, it changed its name to Boston Regional Medical Center, Inc. At all relevant times through February 4, 1999, the date of the Debtor's bankruptcy filing, the Plaintiff operated a hospital in Stoneham, Massachusetts.

2. Elizabeth Krauss was born in 1892.

3. On January 16, 1967, Ms. Krauss executed the Elizabeth Krauss Trust Agreement, which had been prepared for her by the law firm of Ropes & Gray. This trust provided for a number of testamentary bequests, including an unrestricted bequest of $10,000 "to the New England Sanitarium & Hospital, of Stoneham, Massachusetts."[8] Elizabeth Krauss Trust Agreement, Article Third, ¶ a(i).

4. On June 17, 1974, and after consulting with attorney John Foster, Ms. Krauss

---

conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.
28 U.S.C. § 157(c)(1).

**8.** Though this trust, the later amendment thereto, and Ms. Krauss's 1975 will all leave bequests to "New England Sanitarium and Hospital," and not "New England Sanitarium and Benevolent Association," the latter being the name under which the Plaintiff was then incorporated, there is no dispute that the bequests were intended for the Plaintiff.

executed an amendment to the Elizabeth Krauss Trust Agreement. The amendment struck out Article Third of the Trust and substituted for it a new Article Third that, in relevant part, included bequests of the residue of the trust, in equal parts, to New England Sanitarium and Hospital of Stoneham, Massachusetts, and to the Christian Science Mother Church. These gifts were unrestricted.

5. No evidence has been submitted as to which assets, if any, were ever transferred into the Elizabeth Krauss Trust; nor has evidence been submitted as to the disposition of assets acquired by this Trust.

6. On March 21, 1975, Ms. Krauss executed the Last Will and Testament of Elizabeth Krauss ("the will"). She executed this will after consulting with Attorney John Foster, who prepared the will for her. This was in fact Ms. Krauss's last will: after executing this will, she executed no other, and she never revoked the will.

7. Article Eleventh of the will provides for the disposition of the residue of Ms. Krauss's estate with the following language:

I give, devise, and bequeath all of the rest, residue, and remainder of my property, real and personal, and wherever situate, (hereinafter called my "residuary estate") as follows: (i) one-third (1/3) to the New England Sanitarium and Hospital of Stoneham, Massachusetts, to be used to provide a bed for indigent patients; (ii) one-third (1/3) to the Christian Science Board of Directors of the Mother Church, The First Church of Christ, Scientist, in Boston, Massachusetts, to be used for the Relief Fund; and (iii) one-third (1/3) to First Lutheran Church of Boston, 299 Berkley Street, Boston, Massachusetts.

8. In 1988, Ms. Krauss was declared incompetent. In January, 1989, the Massachusetts Probate Court placed her under the guardianship of two co-guardians. She remained incompetent and under guardianship until her death on March 1, 1998.

9. In January, 1989, the Probate Court appointed Vivien Rose and Eve Ross as Ms. Krauss's co-guardians. Vivian Rose, a niece of Ms. Krauss, was the "family co-guardian"; and Eve Ross was the "independent co-guardian." Vivian Rose and Eve Ross served as co-guardians until August 2, 1996, when the Probate Court appointed successor co-guardians: Gary Douglas Rose, son of Vivian Rose, was appointed the family co-guardian, and attorney Hanson S. Reynolds was appointed the independent co-guardian. They remained Ms. Krauss's co-guardians for the rest of her life.

10. In August 1996, upon appointment of the successor co-guardians, Ms. Krauss's financial affairs were in considerable disarray. She owned four pieces of property on Beacon Street in Boston that were in bad repair; she faced considerable debts for utilities, nursing home care, and doctors' bills; and she needed to provide for her continuing care. The co-guardians determined that the Beacon Street properties should be sold in order to generate funds with which to pay Ms. Krauss's debts and to fund her continuing nursing home care and other needs.

11. The Beacon Street properties had been held in the name of Ms. Krauss for so long that the basis of each, for purposes of capital gains taxation, was close to zero. In order to minimize the otherwise substantial tax consequences from sale of these prop-

erties, the co-guardians determined that the properties should first be placed in one or more charitable remainder trusts and a revocable trust, and then sold promptly thereafter by the trusts. The co-guardians believed this could be done in a way that was consistent with Ms. Krauss's will.

12. Accordingly, co-guardian Hanson Reynolds, who is an attorney having considerable experience and expertise in the area of trusts and estates, prepared two declarations of trust: the Declaration of Trust of the Elizabeth Krauss Revocable Trust ("the Revocable Trust"), and the Declaration of Trust of the Elizabeth Krauss Charitable Remainder Annuity Trust ("the 1997 Charitable Remainder Trust"). The co-guardians executed these declarations of trust on July 29, 1997. The Declarations named the co-guardians as Co–Trustees of both Trusts.

13. The Revocable Trust provided that, upon the death of Ms. Krauss, and after other testamentary distributions required by the Trust, the residue would be distributed to BRMC, First Lutheran, and the Christian Science Church in equal shares. The operative language, in article Third of the Trust, is as follows:

THIRD: Upon the death of Elizabeth Krauss, the trust property, all accumulations of income, and any property that may be added to the trust at any time shall be disposed of as follows: ...

D. The trustees shall distribute the balance of the trust property in equal shares to such of the following charitable organizations as are then described in section 2055(a) of the Internal Revenue Code of 1986, as amended:

(a) Boston Regional Medical Center, Inc. (formerly known as The New England Sanitarium & Hospital), located in Stoneham, Massachusetts;

(b) The Mother Church, The First Church of Christ, Scientist, located in Boston, Massachusetts, to be used for the Relief Fund; and

(c) The First Lutheran Church of Boston, located in Boston, Massachusetts.

Revocable Trust (Plaintiff's Exhibit 2), Article Third, ¶ D.

14. The 1997 Charitable Remainder Trust likewise provided for testamentary distribution of the residue of the trust to the same three entities. Its operative language is as follows:

4. *Distribution to Charity.* Upon the death of the Donor [Elizabeth Krauss], the trustees shall distribute all of the then principal and income of the trust (other than any amount due Donor or Donor's estate under section 2 and 3 above) in equal shares to the following charitable organizations:

(a) Boston Regional Medical Center, Inc. (formerly known as The New England Sanitarium & Hospital), located in Stoneham, Massachusetts;

(b) The Mother Church, The First Church of Christ, Scientist, located in Boston, Massachusetts, to be used for the Relief Fund; and

(c) The First Lutheran Church of Boston, located in Boston, Massachusetts.

However, notwithstanding any other provision of this trust instrument, if any charitable organization specified to receive any distribution from this trust in not an organization described

in section 170(b)(1)(A), 170(c), 2055(a), and 2522(a) of the [Internal Revenue] Code (or in corresponding provisions of any subsequent federal tax laws) at the time when any principal or income of the trust is to be distributed to it, then the trustees shall distribute such principal or income to such one or more organizations described in sections 170(b)(1)(A), 170(c), 2055(a), and 2522(a) as the trustees shall select in their discretion, taking into account the wishes of the Donor as best they may be ascertained.

1997 Charitable Remainder Trust (Plaintiff's Exhibit 3), ¶ 4.

15. In both the Revocable Trust and the 1997 Charitable Remainder Trust, the bequests to BRMC contain no restriction on the use of the bequests. The omission of the restriction that Ms. Krauss had included in her will—that the gift was "to be used to provide a bed for indigent patients"—was an intentional omission by the Co-Guardians.

16. Co-Guardian Hanson Reynolds, in particular, had two concerns about the restriction. First, in his experience, restrictions of this kind, especially when ambiguous, as he believed this one was in several ways, often gave rise to litigation and could cause the bequest to fail entirely, which might defeat Ms. Krauss's wishes; it was unclear from the will whether Ms. Krauss, in settling on the language of the restriction, had known and considered the possible consequences of that language. Second, failure of the bequest could have tax consequences for the Trusts and thus defeat Ms. Krauss's wishes by diverting a large portion of her estate into estate and income taxes and away from the intended recipients of her bequests.

17. The Co-Guardians did not omit the restriction without first ascertaining that its removal was in keeping with the wishes of Ms. Krauss as best they could be ascertained. At the time, Ms. Krauss was incompetent and unable to relate her wishes with respect to disposition of her estate, so she was not consulted in the matter. Rather, Hanson Reynolds asked Gary Rose to consult with his mother, Vivian Rose, as to whether, if the restriction were a problem, Elizabeth Krauss would still want the gift to go to BRMC. Vivian Rose was Elizabeth Krauss's closest living relative and the person who would best know her wishes. She had visited often with Elizabeth Krauss, both during the seven-year period when Ms. Rose was Ms. Krauss's "family co-guardian" and for years before. Gary Rose discussed the matter with Vivian Rose and reported back to Hanson Reynolds that both he (Gary) and Vivian believed that Elizabeth Krauss would want the gift to go to BRMC outright, without the restriction. Mr. Reynolds also learned (though he could not remember how) that "the gift came about as a result of Elizabeth Krauss's sister having been in, I believe, the New England Sanitarium and Hospital at Stoneham." Transcript, p. 65.

18. The Co-Guardians did not make inquiry of John Foster, the attorney who had prepared Ms. Krauss's 1975 will, as to Ms. Krauss's wishes with respect to the bequest. They did not do so for several reasons. First, given the passage of 22 years, he likely would have little memory of the important issues, if he had discussed them at all with Ms. Krauss. Second, with the passage of time, property

values were very different, and therefore her bequests raised tax considerations of a magnitude that simply had not been present in 1975; there was no reason to believe Foster might be of assistance on these. Third, Hanson Reynolds was inquiring into Ms. Krauss's wishes at the time of his petition (or as close thereto as possible in view of her intervening incompetence), in view of the circumstances then faced, not into Ms. Krauss's wishes in 1975. And fourth, the Co-Guardians already had the will which Foster himself had drafted, which Hanson Reynolds viewed as speaking for itself.

19. Had the Co-Guardians made inquiry of Foster, they would have obtained no useful information. After execution of her will in March 1975, Elizabeth Krauss never again spoke or consulted with Foster about her will or her testamentary intentions. At the trial in this adversary proceeding. Foster had no memory whatsoever of what Elizabeth Krauss told him about her intention in making a bequest to the Plaintiff; even his notes from his 1975 meeting with her sparked no recollection. He did testify that the restrictive language in the will's bequest to the Plaintiff came from Ms. Krauss herself. I give this testimony little weight, not only because Foster had (by his admission) no recollection of the matter and had offered no other basis for this testimony, but also because it does not answer the relevant questions: First, in settling on this language, had Ms. Krauss first been informed of and considered the concerns, risks, and difficulties to which the chosen language could give rise? And second, how would Ms. Krauss resolve various ambiguities in the language? Foster did not ad-

dress these questions at the trial in 2003 and could no better have done so in 1997, when the Co-Guardians were attempting to ascertain her wishes for purposes of formulating an estate plan that would meet her needs.

20. On the basis of the above inquiry and of what they knew about Ms. Krauss's will and the circumstances in which it was drafted, the Co-Guardians determined that, had Ms. Krauss been informed of the appreciation in the value of her assets and of the tax and litigation risks that were posed by the language of the restriction on the gift to BRMC in her will, Ms. Krauss, when last she was competent, would likely have favored removal of the restriction.

21. On August 14, 1997, the Co-Guardians filed in the Probate Court a petition entitled Petition to Make an Estate Plan for Elizabeth Krauss under M.G.L. c. 201, § 38. By this petition, the Co-Guardians sought authorization under G.L. c. 201, § 38 to transfer certain real and personal property of Elizabeth Krauss in part to the Revocable Trust and in part to the 1997 Charitable Trust, which trusts would in effect replace Ms. Krauss's will as the operative mechanism for testamentary disposition of the trust assets.

22. In the Petition, the Co-Guardians made (among others) the following representations:

a. "Under the will, the residue of the Ward's [Elizabeth Krauss's] estate is divided into equal shares for the following charitable organizations: (a) The New England Sanitarium & Hospital (now known as Boston Regional Medical Center, Inc.); (b) The Christian Science Board of Directors of the Mother Church, First

Church of Christ, Scientist; and (c) The First Lutheran Church of Boston." Petition, ¶ 4.

b. "Upon the Ward's death, the trust property will be distributed in the same manner as currently provided under the Ward's will, including ... the residue to the same three charitable beneficiaries." Petition, ¶ 7.

c. "The transfer of the Ward's assets in part to the Charitable Trust and in part to the Revocable Trust is consistent with the intentions of the Ward insofar as they are expressed in her will and as they otherwise can be ascertained." Petition. ¶ 10.

23. With the Petition, the Co–Guardians also filed copies of the Revocable Trust, the 1997 Charitable Trust, and Ms. Krauss's will.

24. On August 18, 1997, Hanson Reynolds, through his associate Phong Dinh, served the Petition on Ms. Krauss's heirs at law and on all persons and entities who would receive bequests under Ms. Krauss's will, including First Lutheran and the Christian Science Church, but probably without copies of the Trusts and the will. The Petition was also served on the Attorney General (who is required to be notified in matters that affect charities) and on Ms. Krauss's court-appointed guardian ad litem. On the same day, Mr. Dinh also sent letters to First Lutheran and the Christian Science Church, stating:

Enclosed please find a Suffolk County Probate Court notice with respect to the guardianship of Elizabeth Krauss. The enclosed notice relates to the petition of Hanson S. Reynold and Gary Douglas Rose, as co-guardians, to provide an estate plan for Elizabeth Krauss in conformity with her last will and testament dated March 21, 1975 and for the purpose of reducing taxes. If you have no objection to the allowance of the petition of the co-guardians, no action is required on your part. If you should have any question, however, please let me know.

25. The notice that was enclosed with the above letter to First Lutheran and the Christian Science Church, which notice was also sent to all other parties having an interest in the Petition, was a Short Order of Notice issued by Probate Court on August 14, 1997, stating:

A petition has been presented to said Court, Hanson Reynolds, co-guardian of said Ward [Elizabeth Krauss], Praying that this Honorable Court authorize him to transfer the property described in said motion, in part to the Elizabeth Krauss Charitable Remainder Annuity Trust and in part to The Elizabeth Krauss Revocable Trust, pursuant to M.G.L. c. 201, § 38, and for such further relief as this Honorable Court may deem just and proper for the reasons more fully described in said petition. If you desire to object thereto you or your attorney should file a written appearance in said Court at Boston before ten o'clock in the forenoon on the 25th day of August, 1997, the return day of this citation.

26. On August 14, 1997, in connection with the Petition, the Probate Court appointed a guardian ad litem for Ms. Krauss to protect her interests and to report to the Probate Court on her behalf regarding whether the proposed estate plan carried out her wishes as best they could be ascertained. The guardian ad litem, Lawrence T. Perera, reviewed the Petition, consulted with Hanson Reynolds about it, filed a report on the matter in the Probate Court, and expressly assented to the petition.

27. Neither First Lutheran nor the Christian Science Church objected to the Petition. There is no evidence in the record that either sought to take discovery or otherwise to make inquiry with respect to it or that either requested a copy of, or went to the Probate Court to examine, the Revocable Trust, the 1997 Charitable Trust, or the will.

28. No person or entity objected to the Petition.

29. On October 10, 1997, the Probate Court granted the relief requested in the Petition. The order stated:

On the petition of Gary Douglas Rose of Jamesburg, New Jersey, and Hanson S. Reynolds of Dedham, Massachusetts (the "Petitioners") to make an estate plan for Elizabeth Krauss (the "Ward") under M.G.L. c. 201, § 38, after notice to all interested parties, hearing and consideration, the Court orders and decrees as follows:

1. The Petitioners are hereby authorized to transfer real property located at 115 Beacon Street, Boston, Suffolk County, Massachusetts, to The Elizabeth Krauss Charitable Remainder Annuity Trust under Declaration of Trust dated July 29, 1997; and

2. The Petitioners are hereby authorized to transfer (a) real property located at 139–141 Beacon Street, Boston, Suffolk County, Massachusetts, (b) real property located at 391 Beacon Street, Boston, Suffolk County, Massachusetts, (c) the Ward's farm and house located at 112 Brooks Station Road, Princeton, Worcester County, Massachusetts, (d) the Ward's remaining tangible personal property, and (e) the Ward's checking account (currently at BankBoston) to The Elizabeth Krauss Revocable Trust under Declaration of Trust dated July 29, 1997.

No appeal was taken from this order.

30. Pursuant to the authority thus granted by the Probate Court, the Co-Guardians transferred the property of Elizabeth Krauss into the Revocable Trust and the 1997 Charitable Trust.

31. Thereafter, in January or February of 1998, the Co-Guardians filed in the Probate Court a Petition to Revise the Estate Plan of Elizabeth Krauss under M.G.L. c. 201, § 38 ("Petition to Revise"). The Petition sought authority to transfer the real property located at 391 Beacon Street in Boston from the Revocable Trust (into which it had been transferred) to a new trust, the Elizabeth Krauss 1998 Charitable Remainder Annuity Trust ("the 1998 Charitable Trust").

32. With the Petition to Revise, the Co-Guardians filed the 1998 Charitable Trust, dated January 21, 1998. The 1998 Charitable Trust provided for payment of an annuity to Elizabeth Krauss during her lifetime and for payment of the residue to the same three charitable organizations, in equal shares, upon her death. The disposition to charitable organizations is set forth in paragraph 4 and is identical to the language employed by the 1997 Charitable Trust. It states: *Distribution to Charity.* Upon the death of the Donor [Elizabeth Krauss], the trustees shall distribute all of the then principal and income of the trust (other than any amount due Donor or Donor's estate under section 2 and 3 above) in equal shares to the following charitable organizations:

(a) Boston Regional Medical Center, Inc. (formerly known as The New England Sanitarium & Hospital),

located in Stoneham, Massachusetts;

(b) The Mother Church, The First Church of Christ, Scientist, located in Boston, Massachusetts, to be used for the Relief Fund; and

(c) The First Lutheran Church of Boston, located in Boston, Massachusetts.

However, notwithstanding any other provision of this trust instrument, if any charitable organization specified to receive any distribution from this trust in not an organization described in section 170(b)(1)(A), 170(c), 2055(a), and 2522(a) of the [Internal Revenue] Code (or in corresponding provisions of any subsequent federal tax laws) at the time when any principal or income of the trust is to be distributed to it, then the trustees shall distribute such principal or income to such one or more organizations described in sections 170(b)(1)(A), 170(c), 2055(a), and 2522(a) as the trustees shall select in their discretion, taking into account the wishes of the Donor as best they may be ascertained.

1998 Charitable Remainder Trust (Plaintiff's Exhibit 7), ¶ 4.

33. The purposes of the Petition to Revise, and of the transfer for which it sought authorization, were tax-related: (1) to gain for Elizabeth Krauss the benefit of a substantial charitable income tax deduction, and (2) to enable the property to be sold without imposition of capital gains taxes, and thus to preserve more of the value of the property for the charitable remainder beneficiaries than they would have received upon distribution of the property from the Revocable Trust.

34. In the Motion to Revise, the Co-Guardians made (among others) the following representations:

a. "Upon the Ward's death, the property of the Revocable Trust is divided into equal shares for the following charitable organizations: (a) The New England Sanitarium & Hospital (now known as Boston Regional Medical Center, Inc.); (b) The Christian Science Board of Directors of the Mother Church, First Church of Christ, Scientist; and (c) The First Lutheran Church of Boston." Petition to Revise, ¶ 8.

b. "Upon the Ward's death, the remaining property of the Charitable Trust will be divided into equal shares for the same organizations which are currently the charitable residuary beneficiaries under the Revocable Trust." Petition to Revise, ¶ 9.

c. "The transfer of the real property located at 391 Beacon Street from the Revocable Trust to the Charitable Trust is consistent with the intentions of the Ward insofar as they are expressed in her will and as they otherwise can be ascertained." Petition to Revise, ¶ 11.

35. The Co-Guardians served copies of the Petition to Revise and of the 1998 Charitable Remainder Trust on First Lutheran and on the Christian Science Church.

36. To expedite the adjudication of the Petition to Revise, the Co-Guardians asked the three charitable residuary beneficiaries—including First Lutheran and the Christian Science Church—and Ms. Krauss's court-appointed guardian ad litem to sign statements of assent to be filed in the Probate Court. Each did sign such a statement, and all four statements

were filed in the Probate Court on February 9, 1998. The four statements are identical. Each is entitled "Assent to Petition to Revise the Estate Plan of Elizabeth Krauss under M.G.L. c. 201 § 38" and states:

The undersigned, being a party interested in the above matter, hereby consents to the petition of Gary Douglas Rose and Hanson S. Reynolds, as Co–Guardians of the Elizabeth Krauss and Trustees of the Elizabeth Krauss Revocable Trust dated July 29, 1997, to transfer for tax reasons certain real estate located at 391 Beacon Street. Boston Massachusetts, to the Elizabeth Krauss 1998 Charitable Remainder Annuity Trust dated January 21, 1998. The undersigned further consents to the allowance of said petition by this Court and requests that the petition be granted without further notice.

37. On February 12, 1998, the Probate Court entered an order on the Petition to Revise. The order stated:

On the petition of Gary Douglas Rose of Jamesburg, New Jersey, and Hanson S. Reynolds of Dedham, Massachusetts (the "Petitioners") to revise the estate plan of Elizabeth Krauss (the "Ward") under M.G.L. c. 201 section 38, after notice to all interested parties, hearing and consideration, the Court orders and decrees as follows:

1. Gary Douglas Rose of Jamesburg, New Jersey, and Hanson S. Reynolds of Dedham, Massachusetts, trustees of the Elizabeth Krauss Revocable Trust dated July 29, 1997 (also known as the Elizabeth Krauss 1997 Revocable Trust) ("Revocable Trust") are authorized to transfer to The Elizabeth Krauss 1998 Charitable Remainder Annuity Trust dated January 21, 1998 ("Charitable Trust") real property located at 391 Beacon Street, Boston, Massachusetts; and

2. Upon such transfer to the Charitable Trust the trustees may sell real property located at 391 Beacon Street, Boston, Massachusetts for the benefit of the ward.

No appeal was taken from this order. Pursuant to the authority thus granted and before Elizabeth Krauss died, the Co–Guardians transferred the real property located at 391 Beacon Street from the Revocable Trust to the 1998 Charitable Trust.

38. Elizabeth Krauss died on March 1, 1998.

39. After the death of Elizabeth Krauss, BRMC continued to operate as an acute care hospital for another eleven months, through the date of its bankruptcy filing. During this period, the hospital was fully operational, providing a full range of acute-care services, as well as skilled nursing services and out-patient care.

40. During this period, however, BRMC was also experiencing severe financial difficulties and, consequently, was exploring the possibility or merging with or being bought as a going concern by other hospitals. When these options finally disappeared, BRMC determined that it should liquidate its assets under Chapter 11 of the Bankruptcy Code.

41. BRMC filed its petition for relief under Chapter 11 of the Bankruptcy Code on February 4, 1999. Within a few days thereafter, BRMC had entirely discontinued patient care, with intention to liquidate the hospital's assets. In accordance with a confirmed Chapter 11 liquidating plan, the hospital's assets were subsequently liquidated. BRMC never resumed patient care.

42. Since its incorporation, BRMC has at all times been a Massachusetts not-for-profit corporation. BRMC's confirmed plan of reorganization provides that the corporation will retain its status as a not-for-profit corporation through its liquidation until its ultimate dissolution. Under the confirmed plan, all property of the bankruptcy estate is revested in BRMC, to be liquidated and distributed to creditors in accordance with the plan. Under the plan, any surplus remaining after payment in full of all allowed claims and administrative costs is to be transferred to the Southern New England Conference of Seventh Day Adventists (of which BRMC was an affiliate), provided the Conference is qualified as a charitable organization under the Internal Revenue Code and the Massachusetts General Laws.[9] Joint Liquidating Plan of Reorganization, Article 5.8.

43. On December 15, 1999, the Commonwealth of Massachusetts, by its Division of Health Care Finance and Planning ("the Division"), timely filed a proof of claim in this case for pre-petition obligations of the Debtor under G.L. c. 118G, § 18, to the Commonwealth's Uncompensated Care Pool (the "Uncompensated Care Pool Claim"). The Debtor and the Division agreed that this claim was in the amount of $1,702,714.

44. The Uncompensated Care Pool is a creature of Massachusetts law. Since 1996, the Pool has been governed by G.L. c. 118G, § 18[10] and administered by the Division of Health Care Finance and Policy. The Pool is part of the Uncompensated Care Trust Fund, whose purpose is "to provide access to health care for low income uninsured and underinsured residents of the Commonwealth." G.L. c. 118G, § 18(a). The Pool furthers this goal by equitably redistributing the burden of financing uncompensated acute hospital services among all acute care hospitals ("the hospitals") in the Commonwealth.[11] To make a complex statute simple: section 18 creates a fund, the Pool, in part with periodic assessments against the hospitals'

9. However, it is clear in this case that the assets available for distribution will be insufficient to pay all allowed claims and administrative expenses in full; there is no possibility of a surplus being remitted to the Southern New England Conference of Seventh Day Adventists, and the Churches do not contend otherwise. In another adversary proceeding in this case, the Court found that, in a best-case scenario, unsecured creditors would receive a dividend of approximately 35 percent. According to the accountant for the liquidating agent, whose testimony the Court found to be credible, allowable claims total approximately $43,000,000, but the total money available for unsecured creditors is about $14–15,000,000. See *In re Boston Regional Medical Center, Inc.*, 292 B.R. 718, 725–726 (Bankr.D.Mass.2003). In other words, the estate is approximately $30,000,000 short of generating any surplus for the Conference.

10. G.L. c. 118G, § 18 was added by St.1996, c. 151, § 275, which repealed and replaced an earlier and substantially identical version of the same law, which was codified at G.L. c. 118F, § 15 (added by St.1988, c. 23, § 45). The debt at issue in this case relates to calendar years 1996 through 1999. The Commonwealth cites G.L. c. 118G, § 18 as the basis for the entire amount of its claim, so I conclude that the claim is governed entirely by that statute and not by an earlier version of the law.

11. See *General Hospital Corp. v. Rate Setting Comm'n*, 407 Mass. 227, 228, 552 N.E.2d 113 (1990), stating, with respect to an earlier version of the Massachusetts Uncompensated Care Pool law, that the purpose of the Pool is "to more equitably distribute the burden of financing uncompensated acute hospital services across all acute hospitals."

"private sector charges" [12] and in part with other governmental monies and assessments [13]; and then it distributes this fund among the hospitals in proportion to the amount of otherwise-uncompensated care each provides.[14] A hospital's liability to the Pool—that is, the assessment against its private sector charges—is equal to "the product of (1) the ratio of its private sector charges to all acute hospitals' private sector charges; and (2) the private sector liability to the uncompensated care pool as determined by law less [certain surcharges]." G.L. c. 118G, § 18(e). Each hospital's total assessment for a fiscal year is setoff against the Pool's liability to the hospital for uncompensated care during the same period, resulting in either a net liability to the Pool or a net distribution from the Pool. Thus the Pool charges the hospitals' collective private sector revenue to pay for the hospitals' collective burden of uncompensated care, resulting, at bottom, in a net transfer of revenue from those hospitals that provide less uncompensated care (as a proportion of the hospitals' total patient service charges) to those that provide more. The amounts collected by the Uncompensated Care Pool must be expended for the Pool's own purposes, G.L. c. 118G, § 18(d), and therefore may not be used to fund other governmental programs or to defray the costs of state government.

45. BRMC has submitted no evidence as to the amount of care it provided to indigent patients (uncompensated or otherwise) after the death of Elizabeth Krauss.

## COUNTERCLAIM TO REFORM BEQUESTS

Because the counterclaim seeks to reform the operative testamentary language, the Court will begin with the counterclaim. The Interveners seeks an order reforming the gift to BRMC in each of the three trusts to include the limitation from the will, requiring the gift "to be used to provide a bed for indigent patients." They argue that this limitation reflects the wishes of Elizabeth Krauss "as best they can be ascertained," and therefore is required by G.L. c. 201, § 38, which obligates a guardian, in formulating an estate plan for a ward, to carry out the ward's wishes as best they can be ascertained. BRMC defends against the counterclaim on two grounds: (1) that the orders approving the Petition to Make an Estate Plan and the Petition to Revise Estate Plan preclude any collateral challenge to the appropriateness of the testamentary language ("res judicata"); and (2) that elimination of the restriction on the gift to BRMC is in keeping with the wishes of Elizabeth Krauss as best they can be ascertained.

### 1. *Res Judicata*

■ BRMC first argues that the counterclaim to reform bequests in the three trusts is, in essence, an attempt to relitigate, and to collaterally attack the orders on, the Petition to Make an Estate Plan and the Petition to Revise Estate Plan;

12. "Private Sector Charges" is defined as gross patient service revenue attributable to all patients less the portion thereof that is attributable to Medicare, Medicaid, other publicly aided patients, free care, and bad debt. G.L. c. 118G, § 1.

13. G.L. c. 118G, § 18(d).

14. See G.L. c. 118G, § 18(h) and (k) for the manner in which the Pool's liability to each hospital is to be calculated.

and therefore, under the doctrine of res judicata, the counterclaim is barred by the Probate Court orders that granted the relief sought by the Petitions. In response, the Churches argue that the affirmative defense of res judicata does not apply here because (1) the claim presented by the counterclaim was not adjudicated by the Probate Court orders; and (2) the Churches had neither the opportunity nor the incentive in the earlier proceedings to contest the language of the trusts.

■ Under the full faith and credit statute, 28 U.S.C. § 1738,[15] the preclusive effect of a state court judgment in a subsequent proceeding in federal court is governed by the law of the state from which the judgment is taken. *Nottingham Partners v. Trans–Lux Corp.*, 925 F.2d 29, 32 (1st Cir.1991) ("In ascertaining whether issue preclusion flows as a consequence of previous state court litigation, a federal court must look to state law") and *United States v. One Parcel of Real Property*, 900 F.2d 470, 473 (1st Cir.1990) (same). Therefore, the preclusive effect of the Probate Court orders must be evaluated under Massachusetts law.

■ BRMC's defense is one of claim preclusion. "The doctrine of claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and bars further litigation of all matters that were or should have been adjudicated in the action." *Heacock v. Heacock*, 402 Mass. 21, 23, 520 N.E.2d 151 (1988). Claim preclusion applies when three elements are shown: "(1) the identity or privity of the parties to the present and prior actions; (2) identity of the cause of action; and (3) prior final judgment on the merits." *Gloucester Marine Railways Corp. v. Charles Parisi, Inc.*, 36 Mass.App.Ct. 386, 631 N.E.2d 1021 (1994), citing *Franklin v. North Weymouth Coop. Bank*, 283 Mass. 275, 280, 186 N.E. 641 (1933).

### a. *Finality*

Beginning with the last element, I hold that the Probate Court orders on the Petition to Make an Estate Plan and on the Petition to Revise Estate Plan were final judgments on the merits. Earlier in this proceeding, the Churches had argued that the orders were not final because the proceeding in which they were entered, the guardianship of Elizabeth Krauss, has not yet been closed.[16] (It is not clear whether the Churches still take this position; they do not argue it in their post-trial briefs.) This Court holds that the Probate Court orders were final orders because they fully and finally resolved discrete disputes within the guardianship proceeding. It is clear from the nature of the orders that the authority they granted was effective immediately, and was intended to be so, and did not have to await the closing of the guardianship in order to become effective. In view of the fact that the guardianship proceeding was likely to terminate only after the death of Elizabeth Krauss, the Petitions would by such time have become moot (because her will would have become the effective estate plan as to all her assets) and the authority they requested

---

**15.** In relevant part, the statute provides that the judicial proceedings of any state, territory, or possession of the United States "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory, or Possession from which they are taken." 28 U.S.C. § 1738.

**16.** The guardianship proceeding remains open only because the Co–Guardians/Co–Trustees have not yet filed their final accounts. The Churches do not contend that the Petition to Make an Estate Plan or the Petition to Revise Estate Plan remain pending or unresolved.

would have been useless (because upon Ms. Krauss's death, her guardians would no longer have authority over her assets). Moreover, the Supreme Judicial Court has entertained appeals from orders approving estate plans under G.L. c. 201, § 38, which suggests that such orders are viewed by that Court as final and appealable. See, for example, *In the Matter of Murray*, 408 Mass. 731, 563 N.E.2d 217 (1990).

### b. *Identity of Parties*

BRMC must next show that the parties to the present action are identical to or in privity with the parties to the former actions, the petitions to make and revise an estate plan. Again, the Churches do not dispute this element in their post-trial briefs, but they did dispute it earlier, in their opposition to BRMC's motion for summary judgment. There, though they conceded that they were "parties interested in the estate of Elizabeth Krauss," they nonetheless argued that they were not "parties" to the petitions to make and to revise an estate plan. They did not explain precisely what in their view qualifies an entity—and by its absence, disqualifies each of them—as a party to a guardian's petition to make or revise an estate plan for a ward, except by stating: "The ability of the Churches to participate in the Probate Court proceedings was circumscribed by the four corners of the various Petitions that the Guardians submitted to the Court for approval."

The Court rules that the Churches, like BRMC, were parties to the Co–Guardians' petitions to make and revise and estate plan. The petitions were seeking authority from the Probate Court under the second paragraph on G.L. c. 201, § 38. That paragraph states that the Probate Court may grant the authority so requested "after such notice to all other persons interested as it directs."[17] As the Churches concede, they, like BRMC, were parties interested in the Estate of Elizabeth Krauss and in the petitions to make and revise her estate plan: all three were named as residual beneficiaries under Elizabeth Krauss's will, and the petitions sought to alter the provisions by which the residue of her estate would be distributed.[18] Therefore, all three were "persons interested" in the petitions within the meaning of § 38. As persons interested, the statute required that they be afforded adequate notice of the petitions and an opportunity to object and be heard in the matters. Moreover, as I explained above, the statute clearly contemplates that a grant of authority under § 38 to transfer assets of the ward is effective immediately, permitting immediate transfer of the assets, which, in many cases, amounts to an irrevocable *modification* of the ward's estate plan and of the rights or expectancies of parties interested. The statute thus creates a procedure under which parties interested must be afforded adequate notice before the Probate Court may authorize a transfer that will finally affect their rights. Given this procedure, I conclude

---

17. The sentence in question states:
 The probate court, upon petition of a conservator or guardian, other than the guardian of a minor, and after such notice to all other persons interested as it directs, may authorize such conservator or guardian to exercise any or all powers over the estate and business affairs of the ward which the ward could exercise if present and not under disability.

 G.L. c. 201, § 38, ¶ 2.

18. Instead of passing through the will, the residue would now be distributed through testamentary provisions in three trusts. And the testamentary language would be changed at least to the extent necessary to ensure that the bequests would qualify for the tax treatment.

that the residuary beneficiaries, including BRMC and the two Churches, were parties to the Co–Guardians' petitions to make and revise an estate plan.

### c. *Identity of the Causes of Action*

Third, BRMC must show that the present cause of action is identical to the causes of action in the Co–Guardians' petitions to make and revise an estate plan. The Churches argue that the present cause of action is not identical to those presented by the former petitions because the present action concerns the Co–Guardians' modification in the terms of the gift to BRMC, while the former petitions sought authority only to transfer assets into the trusts and did not indicate that the trusts were modifying (from the will) the terms of the gift to BRMC or seek authority for that modification.

The Court holds that the present and former causes of action are identical. In their petitions, the Co–Guardians sought authority "to make an estate plan" and later "to revise estate plan" by transferring assets of the ward into trusts that would act as substitutes for the will as the vehicle for testamentary gifts to BRMC and the Churches. As a condition of granting such authority, the Co–Guardians were obligated to establish that the proposed transfers were "in keeping with the ward's wishes so far as they can be ascertained." [19] The basis of the present counterclaim to reform the trusts is precisely that the dispositive language in the trusts, insofar as it eliminates the will's restriction on the gift to BRMC, is not in keeping

with the ward's wishes as far as they can be ascertained, and therefore that § 38 prohibits the transfer of assets into the trusts having such language. The Churches do not ask that orders on the Co–Guardians' petitions to make and revise an estate plan be vacated and the petitions be denied; they seek an alternate remedy under which the dispositive language would be modified to reflect what they contend are Elizabeth's Krauss's wishes as far as they can be ascertained. But the fact that a different remedy is sought is not dispositive. *Heacock v. Heacock*, 402 Mass. at 23, 520 N.E.2d 151 (citing Mackintosh v. Chambers, 285 Mass. 594, 596–597, 190 N.E. 38 (1934), and cases cited; and Restatement (Second) of Judgments § 25 (1980)) (claim preclusion applies even though the claimant in second action seeks different remedies than in first). The underlying issue is exactly the same as was presented by the Co–Guardian's petitions: whether the transfer of assets into trusts having these testamentary provisions is permissible under § 38. The claims are identical.

The Churches argue that this issue was not actually adjudicated because, as BRMC does not dispute, (1) no objection was raised to the modification of the testamentary language, (2) the issue was not actually *litigated,* and (3) the Probate Court issued no findings and rulings on the issue. But this argument is baseless because none of these—objection, litigation, the entry of findings and rulings—is adjudication. The essence of adjudication

---

**19.** The relevant sentences state:

The court may authorize the taking of such action, or the application of such funds as are not required for the ward's own maintenance and support, in such fashion as the court shall approve as being in keeping with the ward's wishes so far as they can be ascertained.... The ward's wishes as best they can be ascertained are to be carried out, whether or not tax savings are involved....

The conservator or guardian shall also indicate in the petition that any planned disposition is consistent with the intentions of the ward insofar as they can be ascertained[.]

G.L. c. 201, § 38.

is in the Court's issuance of an order that finally disposes of a petition, motion, complaint, or other request for relief. This matter was actually adjudicated: the Probate Court did authorize the transfer of Elizabeth Krauss's assets into trusts having the disputed testamentary language.

■ Moreover, the doctrine of claim preclusion bars further litigation not only of the claim actually adjudicated but also of any other that "should have been adjudicated in the action." *Heacock v. Heacock,* 402 Mass. at 23, 520 N.E.2d 151. If the claim that the Churches now raise as their counterclaim were not identical to the one actually litigated by the Probate Court on the Co–Guardians' petitions to make and revise an estate plan, it would have been at least a compulsory counterclaim to the Co–Guardians' petitions, arising as it does out of precisely the same transaction and nexus of operative facts as did the petitions. MASS. R. CIV. P. 13(a) (defining compulsory counterclaims), made applicable by MASS. R. CIV. P. 1 to petitions seeking equitable relief in the Probate Court.

### d. *Opportunity and Incentive to Litigate*

The Churches argue that claim preclusion should not apply because they had neither the opportunity nor the incentive to litigate the present issue in response to the Co–Guardians' petitions to make and revise estate plan. The Court rejects this argument on both factual and legal grounds.

First, it is not true that the Churches had no opportunity to litigate these issues.

The Churches were given due notice of the petitions and elected not to conduct discovery and to investigate or challenge the propriety of the proposed transfers; in the case of the petition to revise, the Churches elected to assent to the petition. It is true that the petitions stated that the distribution under the trust would be distributed in the same manner as under the will and did not indicate that the gift to BRMC was being modified, but this in itself was no deprivation of opportunity; when a party lacks first-hand knowledge of the veracity of an allegation in a petition or complaint, the usual course is to conduct the necessary discovery to find out.[20] All the relevant evidence—only the will and the trusts themselves were needed—was in existence and available for the asking. Here, the Churches merely failed to avail themselves of the opportunity.

Second, neither was incentive lacking. The Churches claim that they lacked incentive for numerous reasons: (1) Ms. Krauss had not yet died, but only upon her death would the Churches acquire an actual interest in her estate; (2) BRMC had not yet closed its doors and ceased providing charitable service; (3) BRMC was not yet in bankruptcy; (4) preservation of the trust corpus was the most tangible interest that each of the three charitable beneficiaries had at the time; (5) the Attorney General's office had not concluded that BRMC was incapable of fulfilling the general charitable purpose intended by Ms. Krauss[21]; and (6) it was not until after BRMC's bankruptcy filing in 1999 that Co–Guardian Hanson Reynolds revealed that the BRMC bequest restriction was

---

20. Moreover, the Churches should have known that the distributions under the trusts could not have been made in exactly the same manner as under the will; absent some changes, the trusts could not have accomplished the tax savings that were their clear and announced purpose.

21. The Court has no evidence that the Attorney General's office has made such a finding.

omitted from the trusts.[22] These facts all tend to give the Churches *greater* incentive to challenge the petition than they had when the petitions were filed, but they do not establish that the Church had no incentive when the petitions were filed. At that time, they were named as residuary beneficiaries in the will of a woman who was 105 and had been under guardianship for approximately nine years. Their interests were not fixed, but they nonetheless had interests, in the nature of expectancies, in Ms. Krauss's estate; and, in view of her age and incompetence and of the requirements in § 38 on adhering to the wishes of the ward, their expectancies were more than adequate incentive. Moreover, the statute in question (G.L. c. 201, § 38) obligated them, as interested parties, to object when the Co–Guardians' petitions were presented; it did not afford them the luxury of waiting until circumstances ripened to their satisfaction. Their incentive was sufficient then to justify claim preclusion now.

█ Third, although claim preclusion in a second proceeding is justified in part by the fact that the party to be bound by a prior judgment had opportunity and incentive to litigate the matter in the first proceeding, see *Heacock v. Heacock*, 402 Mass. at 24, 520 N.E.2d 151, opportunity and incentive are not themselves elements that the party invoking claim preclusion must show. (The same is not true with issue preclusion.) Provided the party to be bound was a party to the first proceeding, opportunity and incentive are presumed to have been sufficient.[23]

For all these reasons, the Court concludes that the orders of the Probate Court on the Co–Guardians' petitions to make and revise an estate plan preclude the Churches' counterclaim and require that it be dismissed with prejudice.

### 2. *Merits of Counterclaim*

█ Though I have concluded that the counterclaim must be dismissed on the basis of claim preclusion, the parties have addressed the merits, and judicial economy dictates that this Court should also set forth its proposed findings and conclusions thereon, so that, if the District Court does not deem the counterclaim precluded, the parties and the District Court will have the benefit of proposed findings and conclusions on the merits.

█ In Massachusetts, a party seeking to reform a trust bears the heavy burden of adducing "full, clear, and decisive proof" that, because of mistake or fraud, the language of the trust does not conform to the settlor's intention. *Walker v. Walker*, 433 Mass. 581, 587, 744 N.E.2d 60 (2001) (requiring "clear and decisive proof that the instrument fails to embody the settlor's intent"); *Shawmut Bank, N.A. v. Buckley*, 422 Mass. 706, 714, 665 N.E.2d 29 (1996) (where settlor executes a trust instrument which, because of a scrivener's mistake, fails to embody the settlor's intentions, the trust instrument may be reformed upon full, clear, and decisive proof of mistake). In this instance, the trusts were created and settled by Ms. Krauss's Co–Guardians, but it is Ms. Krauss's intentions that are at issue; BRMC does not dispute this. Therefore, the Churches bear the burden

---

22. The Churches put in no evidence as to when they first learned that the terms of the BRMC bequest had been changed from those in the will.

23. If opportunity and incentive were not sufficient to justify the prior judgment, those deficiencies should have been raised in the first proceeding. They cannot be used to escape the first judgment by collateral attack in a second proceeding.

of adducing full, clear, and decisive proof that the omission of the limitation on the gift to BRMC from the three trusts was contrary to the clear intent of Ms. Krauss when the trusts were settled—or, given that she was incompetent at that time, when she was last competent. It is not enough to show, as the Churches seem to argue, that, in their petitions to make and revise an estate plan, the Co–Guardians failed to disclose that a limitation on the gift to BRMC was being omitted from the trusts. Even if the Co–Guardians, in their petitions, misrepresented the contents of the trusts and thereby breached their duties to Ms. Krauss, the Court, and the Churches, such breaches would not be cause to reform the trusts unless omission of the limitation caused a clear departure from the intention of Ms. Krauss. Therefore, the threshold inquiry is: have the Churches demonstrated by full, clear, and decisive proof that the omission of the limitation on the gift to BRMC from the three trusts was contrary to the intent of Ms. Krauss? For the following reasons, the Court finds and concludes that they have not.[24]

First, the evidence shows that in all three testamentary instruments that she is known to have executed since 1967—the 1967 and 1974 trusts and her 1975 will—Ms. Krauss included a gift to BRMC. In the two earliest documents, the gifts were unrestricted. Only in the will did she add the restriction. The will is some evidence that she favored the restriction, but the three documents together indicate a consistent intent over time to make a gift to BRMC. Even the gift "to be used for a bed for indigent patients" was a gift to BRMC. She clearly intended a gift to BRMC, and the restriction was a refinement of the gift, not a diversion. It is unlikely that she would have wanted for the gift to BRMC to fail entirely on account of a defect in the restriction.

Second, though Ms. Krauss had three times attended to her estate plan between 1967 and 1975, she never again revised that plan, and by 1997, it had been neglected and was manifestly in need of revision; consequently, the fact that Ms. Krauss never revised her will is not necessarily evidence that she remained entirely satisfied with its provisions. More likely, it reflects a measure of neglect or inability. When she executed her will in 1975, she was 82 or 83 years old. She was adjudicated incompetent some thirteen years later, not having revised her estate plan. And when the successor Co–Guardians took over from the original co-guardians in 1996, they found that her estate plan still had not been revised since 1975, and that Ms. Krauss's finances were in considerable disarray and need of attention. Circumstances had changed since 1975. Ms. Krauss was no longer able to manage her real estate holdings and now needed to liquidate them in order to finance her continuing care and pay her debts. Her real estate had appreciated substantially in value, and its liquidation presented concerns about capital gains taxation that her will had not been designed to address. In

24. Moreover, if, in this proceeding, the burden were on the defendants in counterclaim to prove, under G.L. c. 201, § 38, that the omission of the restriction was in keeping with the ward's wishes as best they can be ascertained, the Court would find that they had sustained that burden. Ms. Krauss's intentions could not have been ascertained with perfect certainty, but that is not the standard.

*Matter of Jones,* 379 Mass. 826, 839, 401 N.E.2d 351 (1980) (conservator seeking approval of proposed estate plan of ward under G.L. c. 201, § 38 is not required to prove that plan conforms with absolute certainty to ward's wishes). Far more likely than not, Ms. Krauss would have preferred the Co–Guardians' modification to the language of her will.

twenty-one years, the circumstances of her charitable beneficiaries might also have changed and were certainly in need of review. Notably, the Commonwealth had recently instituted the Uncompensated Care Pool, under which financial responsibility for care for indigent patients was to be shared among hospitals in the Commonwealth.

Third, as Co–Guardian Hanson Reynolds credibly testified, the restriction on the gift to BRMC was ambiguous and, simply by being a restricted gift, liable to generate difficulties of many kinds: it might well generate costly litigation, delay the distribution of the residue to the charitable remainder beneficiaries, cause tax consequences that would divert a substantial portion of the estate away from intended beneficiaries, and even cause the gift to fail entirely. The Co–Guardians were correct to be concerned about these possibilities—they were manifestly correct about the litigation and consequent delay, and the Churches are here seeking a determination that the gift fails—and it is safe to conclude that Ms. Krauss, too, would have been concerned about them had they been brought to her attention.

Fourth, in view of the ambiguity in the language of the restriction on the gift to BRMC, it seems likely that the risks posed by the chosen language had not been explained to Ms. Krauss. Mr. Foster, the attorney who drafted the will for Ms. Krauss, stated that it was his belief (he had no actual memory of the events of 1975) that the wording of the restriction had been Ms. Krauss's own wording, which he had simply inserted into the will. If this testimony carries any weight at all, it tends to confirm that Ms. Krauss's wording had simply been inserted into the will without discussion. No attention had been given to specifying what precisely Ms. Krauss intended by the restriction or to drafting the restriction in a form that would assure the success of the gift and insulate it from challenges. I need not speculate as to whether such discussion and attention were warranted in 1975; they certainly were warranted in 1997, and Ms. Krauss would very likely have been receptive to these concerns and to the legal advice of her Co–Guardian, attorney Hanson Reynolds.

Fifth, there is no evidence that, in 1975, Ms. Krauss and attorney Foster discussed or considered the effects of the restriction on BRMC. Might the restriction, by its nature, impose a need for segregation of funds, separate accounting, and isolation of services from other hospital protocols, and thus constitute more of a burden than a benefit to BRMC in its care of indigent patients? How soon did the gift have to be used for its specified purpose after receipt of the gift? Was the requirement of "a bed" a restriction to in-patient care, or could the gift be used for outpatient services, too? Nor was consideration given to the fact that money (revenue) is fungible, such that a restricted bequest "for a bed for indigent patients" might not increase the total money that the hospital would devote to that purpose but would merely enable the hospital to divert other monies it otherwise would have devoted to that purpose into other purposes. Would the condition (that the gift be used for a bed for indigent patients) be satisfied as long as BRMC provided service to indigent patients of a value at least equal to the amount of the gift, even if, before the gift was made, the hospital was already providing that level of services to indigent patients? Or did the gift require that the hospital increase its services by the amount of the gift? These considerations would considerably lessen the likelihood that Ms. Krauss would prefer a restricted gift to an unrestricted.

Sixth, the institution in 1996 of the Uncompensated Care Pool is another factor bearing on the BRMC gift restriction that Ms. Krauss could not have considered in 1975. Under this pooling arrangement, in which BRMC was obligated to and did participate, responsibility for care for indigent patients was to be shared equitably by all acute-care hospitals in the Commonwealth. The effect of this pool was to lessen (though not eliminate entirely) the importance of a restricted gift, of revenue devoted exclusively to providing a bed or medical care for indigent patients. BRMC might provide such bed or care by a payment to the Pool from general revenue, and might likewise be compensated for such otherwise unfunded care by a gift from the Pool. Even after institution of the Uncompensated Care Pool, Ms. Krauss might still have preferred a restricted gift, but the Pool would make that less likely than before.

For all these reasons, the will cannot be taken as the sole and dispositive evidence of Ms. Krauss intent with respect to the restriction. The Co–Guardians had good cause to believe that Ms. Krauss would likely prefer to eliminate the restriction on the gift to BRMC. Ms. Krauss wished to make a gift to BRMC, and she would likely have favored obviation of difficulties that imperilled gift. That could be done by removal of the restriction.[25] Elimination of the restriction was a reasonable means of preserving the gift and serving the intentions of Ms. Krauss as best they could be determined. The evidence satisfies the standard imposed by G.L. c 201, § 38:

that elimination of the restriction was in keeping with the ward's wishes as far as they could be ascertained. More to the point, the evidence and considerations outlined above mean that the Churches have not, by full, clear, and decisive proof, demonstrated that the omission of the limitation on the gift to BRMC from the three trusts was contrary to the intent of Ms. Krauss. The evidence falls far short of meeting that burden. I therefore conclude that, if the Counterclaim is not precluded by res judicata, it should be dismissed on its merits.

■ Lastly, the counterclaim must also fail for lack of standing. In their counterclaim, the Churches argue that the trusts must be reformed because they do not adhere to the wishes of Ms. Krauss as best they can be ascertained. The interest at issue belongs in the first instance to Ms. Krauss, not to the Churches. But the interests of Ms. Krauss were represented in the Probate Court proceedings by (in addition to her Co–Guardians) a guardian ad litem who was appointed by the Probate Court to represent her interests. Under Massachusetts law, if a right or an interest in property of a person under disability is affected by a proceeding of any kind and the Court appoints a guardian ad litem to appear and act on that persons behalf in the proceeding, then any order entered in the proceeding shall be conclusive upon the person for whom the guardian ad litem was appointed. G.L. c. 201, § 34.[26] So the interests and rights of

**25.** It might have been done in other ways, too—perhaps by making the restriction more specific and less ambiguous—but that too would have involved guessing at what specifically Ms. Krauss had in mind. It is important to keep in mind that, by virtue of its ambiguity, the restriction itself is less than clear as to what Ms. Krauss intended. And, at the time

that the trusts were drafted, time was of the essence.

**26.** Section 34 states:

If, under the terms of a written instrument or otherwise, a minor, a mentally retarded person, an autistic person, or person under disability, or a person not ascertained or

Elizabeth Krauss with respect to the gift to BRMC have been conclusively determined, and therefore the Churches lack standing to advance arguments that are in essence derivative of, or predicated on, Ms. Krauss's rights and interests in the matter.[27]

For all these reasons, the counterclaim must be dismissed, and the operative language of the gifts to BRMC is the unreformed language of the trusts themselves, each of which provide for an unrestricted gift to BRMC.

## COMPLAINT: VALIDITY AND EXTENT OF BRMC'S INTERESTS IN TRUSTS

 In its complaint, BRMC seeks first a determination that the bequests in the trusts to BRMC are valid and enforceable, and that BRMC remains qualified to receive them. The Co–Trustees of the three trusts take no position on the issue and advance no arguments in opposition to BRMC's entitlement to a one-third interest in the residue of each trust. Only the Churches dispute BRMC's entitlement. Their opposition is based on a single argument: that BRMC is not entitled to a distribution because its equitable interest in the three trusts is subject to a quasi trust to use the assets in performing its charitable functions, and such functions do not include the repayment of creditors in bankruptcy. In response, BRMC does not dispute that any distribution it received would indeed be used to pay its creditors in bankruptcy. Rather, it argues that the BRMC's entitlement must be adjudicated as of the date on which its interests in the trusts vested, and that vesting occurred when Ms. Krauss died on March 1, 1998, at which time BRMC was not in bankruptcy but remained fully operational, providing the full range of medical services that constituted its charitable function. To this, the Churches respond by conceding that BRMC's equitable interests in the trusts vested at the time of Ms. Krauss's death; but, they argue, an equitable interest is not title to the trust assets, and BRMC does not yet have legal title to the assets. Moreover, regardless of when BRMC was entitled to receive the assets, it is not entitled to receive them if it cannot use them for a charitable purpose. BRMC has the better of this argument for two reasons.

### a. Relevant Date

First, BRMC's equitable interests in the trusts vested upon the death of Elizabeth Krauss, and, according to the terms of each of the three trusts, each such interest included *a right to a distribution* of BRMC's one-third interest in the trust

not in being, may be or may become interested in any property real or personal, or in the enforcement or defense of any legal rights, the court in which any action, petition or proceeding of any kind relative to or affecting any such estate or legal rights is pending may, upon the representation of any party thereto, or of any person interested, appoint a suitable person to appear and act therein as guardian ad litem or next friend of such minor, mentally retarded person, autistic person, or person under disability or not ascertained or not in being; and a judgement, order or decree in such proceedings, made after such appointment, should be conclusive upon all persons for whom such guardian ad litem or next friend was appointed. G.L. c. 201, § 34.

27. BRMC made this argument under the heading of claim preclusion, arguing that G.L. c. 201, § 34 precludes the Churches from advancing their counterclaim. The Court agrees that the Churches' counterclaim is statutorily precluded by § 34, but the issue may also be viewed as one of standing, the statute having, in essence, placed all standing with respect to the rights and interests of Ms. Krauss in the guardian ad litem.

*upon the death of Elizabeth Krauss.*[28] Therefore, BRMC became entitled to a distribution of its share of the trusts' assets immediately upon Ms. Krauss's death. At that time, BRMC remained fully operational, providing the full range of medical services that constituted its charitable function, and it would continue to provide medical services for another eleven months. Though its was struggling financially when Ms. Krauss died, BRMC had no plans at that time to close. In short, the hospital remained a functioning charity at the time that matters, the date on which it became entitled to a distribution from the trusts. The delay attendant upon administration and distribution of the trust corpus should not be a determinative factor in a charitable beneficiary's qualification.[29]

### b. *Payment of Creditors as a Charitable Purpose*

Second, at the heart of the Churches' argument is the proposition that a charitable organization's payment of creditors, to whom the organization incurred debts in order to further the charitable mission of the organization, is somehow separate from the charitable purpose of the organization and of gifts to that organization. This proposition cannot withstand scrutiny. A hospital provides medical services by paying its physicians, nurses, technicians, pharmacists, and therapists to provide those services and by paying its suppliers, administrators, lenders, staff, utilities, independent contractors, etc., all of whom make it possible for the hospital to exist and function. When these individuals and entities are not paid contemporaneously with their provision of goods or services—virtually all are paid in arrears—they become creditors. Without payment of these creditors, a hospital, even a not-for-profit hospital, simply would not exist. The payment of creditors is essential and integral to the carrying on of the charitable mission of the hospital. Indeed, it is the creditors who carry out the charitable work.

One who donates money to a hospital contemplates that the monies donated will be used to advance the medical mission of the hospital. In doing so, they do not contemplate that hospital personnel will apply donated monies directly to patients' wounds. They understand full well that the hospital will use the funds to pay the employees and other creditors through whom it provides medical care to its patients.

Therefore, assuming for the sake of argument that, in Massachusetts, a charitable corporation receives bequeathed funds in quasi-trust for the medical care of the hospital's patients, it simply cannot be the

---

**28.** Revocable Trust (Plaintiff's Exhibit 2), Article Third and ¶ D thereof; 1997 Charitable Remainder Trust (Plaintiff's Exhibit 3), ¶ 4; 1998 Charitable Remainder Trust (Plaintiff's Exhibit 7), ¶ 4.

**29.** *Montclair Nat. Bank & Trust Co. v. Seton Hall College of Medicine and Dentistry,* 233 A.2d 195, 96 N.J.Super. 428 (1967). Applying New Jersey law, the *Montclair* court stated:

Allowing for the delay inherent in administering estates, a charitable institution has by virtue of the active pursuit of its intended purpose on the date of testator's demise, at least the right to the immediate enjoyment of a legacy; that interest is not lost by the subsequent termination of its program, 4 Scott, Trusts (2d ed.1956), § 397.3, pp. 2795–2796.

*Id.,* 233 A.2d at 200, 96 N.J.Super. at 437. Accordingly, the court held that a college of medicine and dentistry which was actively engaged in the teaching of medicine when the testator died was entitled to receive payment of the legacy and to use the legacy for payment of debts it incurred in teaching medicine, even though the corporation was not teaching medicine at the time of distribution.

case that the quasi-trust precludes use of the funds for payment of creditors. If payment of creditors were inconsistent with the charitable mission of a charitable corporation, then such corporations would have to pay for goods and services in advance, and they could never use debt financing. In a credit economy, such insistence on payment in advance would hobble charities in the performance of their charitable functions.[30] Not surprisingly, the Churches have adduced no Massachusetts law or authority to the effect that a trustee or charitable organization violates its trust or charitable purpose by incurring debt or by paying the creditors of the trust or charity.

Nor does it make a difference that, in this instance, the hospital has ceased providing medical services. The focus is on the purpose of the payment, not its timing. The debts in question were incurred in furtherance of the charitable mission of the hospital, while BRMC was operating as a hospital, and the incurring of that debt did further the mission of the hospital. The fact that the creditors are being paid in arrears is irrelevant. The honoring of obligations at the end of a charitable organization's life is no less integral to its mission than was the incurring of those obligations to further that mission. Both, inseparably, serve its charitable purpose.

There is no Massachusetts law on point.[31] The Churches cite two cases for the proposition that the charitable purpose of an organization does not include pay-

ment of a bankrupt charitable donee's creditors: *In re Bishop College*, 151 B.R. 394, 400 (Bankr.N.D.Tex.1993) (applying Texas law); and *In re Kraetzer*, 119 Misc.2d 436, 439–40, 462 N.Y.S.2d 1009, 1012–1013 (1983) (applying New York Law). Neither case attempts to explain (1) how a charitable organization can perform its charitable purpose without paying its employees, lenders, suppliers, etc., (2) how a charitable hospital might use its donations if not to pay its employees, lenders, suppliers, etc., and (3) why payment in arrears is materially different (for purposes of determining charitable purpose) from advance or contemporaneous payment. In both cases, the court simply assumed without consideration that payment of a charity's creditors is inconsistent with and beyond its charitable purpose.

That issue *was* considered is *Montclair Nat. Bank & Trust Co. v. Seton Hall College of Medicine and Dentistry, supra*, where the court held, concerning a gift to a medical school that had closed before distribution of the trust corpus:

> the gift was intended to promote medical education, but nowhere is it alleged that Seton Medical's debts were not contracted as the result of services and expenses related to that end.... We are of the opinion that the application of the funds here involved towards the diminution of the corporate debts would have the effect of furthering testator's intended charitable and testamentary purpose,

---

**30.** The inability to use debt financing would be especially constraining to charitable organizations that, by their nature, can raise no capital through equity investment.

**31.** The Supreme Judicial Court has held that a Massachusetts charitable corporation's non-use of its corporate powers does not does not result in forfeiture of such corporate powers or impair the corporation's rights to receive legacies. *Old Colony Trust Co. v. Third Uni-*

*versalist Society*, 285 Mass. 146, 149, 188 N.E. 711 (1934). But in that case, the corporation had the ability to apply the funds at issue to its charitable purpose. In the present matter, there will be no resumption of hospital operations, and the question is whether payment of creditors, the only use to which the bequest can now be put, is in keeping with the charitable purpose of the bequest. That question was not answered in the *Old Colony* case.

i.e., the payment of expenses incurred in teaching medicine and dentistry.

*Id.*, 233 A.2d at 200, 96 N.J.Super. at 438. The operative principal is the same here: the charitable purpose of a hospital is furthered by payment of the debts and expenses the hospital incurred in furtherance of its charitable purpose, and a donor of money to such a hospital fully expects that this is the purpose to which her donation will be put. I believe the Massachusetts Supreme Judicial Court would rule accordingly.

Therefore, even if the validity of the gifts to BRMC were to be determined as of the date of actual distribution, after BRMC had ceased to function as a hospital such, the gifts would still serve the hospital's charitable mission. BRMC remains entitled to the gifts.

### COMPLAINT: DISTRIBUTION AND TURNOVER

BRMC's complaint is cast as one under 11 U.S.C. § 542(a) for an order requiring the Co–Trustees of the three trusts to turnover to BRMC the funds representing BRMC's one-third interest in the assets of each of the three trusts. Having determined that BRMC is entitled to the gifts in each of the trusts, and that, under each trust, BRMC's right to a distribution arose on the date of Ms. Krauss's death, it is clear that BRMC is entitled, under the trusts themselves and Massachusetts law, to an order requiring that the Co–Trustee's distribute to BRMC the funds constituting BRMC's one-third interest in the assets of each of the three trusts, and

judgment should enter to that effect. Because the Joint Liquidating Plan of Reorganization revested all assets of the estate in BRMC, BRMC's interests in the trusts and its right to a distribution are no longer assets of the bankruptcy estate, and therefore it is not clear whether the bankruptcy turnover statute also applies here.[32] However, even if the turnover statute does not apply, the result is the same: BRMC is entitled to a distribution of its share of the trust assets, in order that such funds may be distributed by BRMC's Liquidating Agent in accordance with the Joint Liquidating Plan of Reorganization.

### CONCLUSION

Pursuant to 28 U.S.C. § 157(c)(1) and in accordance with Fed. R. Bankr. P. 9033(a), the Court hereby enters and files the above findings and conclusions as proposed findings of fact and conclusions of law.[33] Upon expiration of the objection period specified in Rule 9033(b), the Court will transmit the proposed findings and conclusions and any objections thereto, together with the entire record in this adversary proceeding, to the District Court for appropriate disposition in accordance with § 157(c)(1) and Rule 9033(d).

---

**32.** The turnover statute is 11 U.S.C. § 542(a), which requires that an entity in possession, custody, or control, during the case, of property that the trustee in bankruptcy may use, sell, or lease under section 363 of the Bankruptcy Code—that is, property of the estate—shall deliver such property to the trustee. The interests and rights in question were assets of the estate, but, by virtue of the con-

firmed Joint Liquidating Plan, now belong to BRMC.

**33.** In relevant part, Fed. R. Bankr. P. 9033(a) states: "In non-core proceedings heard pursuant to 28 U.S.C. § 157(c)(1), the bankruptcy judge shall file proposed findings of fact and conclusions of law."