# United States Court of Appeals
## For the First Circuit

No. 04-2241

IN RE BOSTON REGIONAL MEDICAL CENTER, INC.,

Debtor.

———————————————

BOSTON REGIONAL MEDICAL CENTER, INC.,

Plaintiff, Appellee,

v.

HANSON S. REYNOLDS, TRUSTEE, ET AL.,

Defendants, Appellees.

———————————————

FIRST LUTHERAN CHURCH AND THE FIRST CHURCH OF CHRIST, SCIENTIST,

Intervenors, Appellants.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

[Hon. Carol J. Kenner, U.S. Bankruptcy Judge]

———————————————

Before

Boudin, Chief Judge,
Torruella and Selya, Circuit Judges.

———————————————

Theodore E. Dinsmoor, with whom Burns & Levinson LLP was on brief, for appellant First Church of Christ, Scientist.

Michael C. Gilleran and Pepe & Hazard, LLP on brief for appellant First Lutheran Church.

Charles R. Bennett, Jr., with whom David C. Kravitz, Christopher M. Morrison, and Hanify & King, P.C. were on brief, for debtor-appellee.

Robert B. Foster and Rackemann, Sawyer & Brewster, P.C. on brief for trustee-appellee.

_____

June 14, 2005

_____

**SELYA**, <u>**Circuit Judge**</u>. This appeal presents a mare's nest of exotic legal problems. At the outset, it requires us to resolve a novel question of bankruptcy jurisdiction. After deciding that question, we must then determine whether, under Massachusetts law, a nonprofit organization that has ceased operations may nonetheless receive a charitable bequest. Because the charitable organization was still functioning as such at the time its entitlement to the bequest vested, we conclude that the bequest may be paid.

## I. BACKGROUND

Elizabeth Krauss executed her last will and testament in 1975. That instrument bequeathed the residue of her estate in equal shares to the New England Sanitarium and Hospital of Stoneham, Massachusetts (New England Sanitarium), First Lutheran Church of Boston (First Lutheran), and First Church of Christ, Scientist (the Mother Church). It specified that the bequest to the New England Sanitarium was "to be used to provide a bed for indigent patients."

In 1988, a state probate court adjudged Ms. Krauss incompetent and placed her under guardianship. Eight years later, the court appointed successor guardians in the persons of Gary Douglas Rose (Ms. Krauss's grand-nephew) and Hanson S. Reynolds (an attorney). The new guardians found Ms. Krauss's financial affairs in disarray. They concluded that it would be best to sell her realty, thus making her estate more liquid and raising funds that

-3-

could be used to settle her debts and defray the costs of her nursing care.

To minimize potential tax liabilities, the guardians proposed to transfer the real estate to certain inter vivos charitable trusts as a precursor to any sale. These transfers would render the testamentary bequests nugatory but, to effectuate Ms. Krauss's original intent, the guardians drew the trust indentures to provide that, upon Ms. Krauss's death, the remaining corpus would be divided in equal portions among the three residuary beneficiaries named in the will. By then, the New England Sanitarium had changed its name to Boston Regional Medical Center (BRMC), and the indentures of trust named BRMC, First Lutheran, and the Mother Church as residuary beneficiaries. This stipulation did not include the preexisting limitation on the gift to BRMC (that the funds "be used to provide a bed for indigent patients"). According to Reynolds, the guardians deliberately eliminated the restriction because they believed that it was ambiguous and, as such, might cause a failure of the bequest.

On October 10, 1997, the probate court confirmed the guardians' plan for transferring and then selling Ms. Krauss's assets. The real estate was transferred and sold, and the trusts were funded. The guardians were named as co-trustees.

On March 1, 1998, Ms. Krauss died at the age of 105. The trustees neither initiated any contact with the named beneficiaries

-4-

at that time nor made any immediate distribution of the corpus. The record does not indicate that BRMC even knew of Ms. Krauss's death, let alone of the windfall that her demise betokened.

Approximately eleven months later, BRMC closed its doors, halted hospital operations, and filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. At the time, it was still not aware that it was a beneficiary of the Krauss trusts. Thus, BRMC did not list any expected distribution from the trusts among the assets of the bankruptcy estate.

On January 18, 2000, the bankruptcy court confirmed BRMC's plan of reorganization (the Plan). The Plan was strictly a liquidating plan. Under it, all of BRMC's assets were vested in a reorganized BRMC, which we shall call liquidating BRMC or L-BRMC.[1] L-BRMC's sole purpose is to liquidate the marshaled assets and distribute the net proceeds to BRMC's creditors in accordance with the provisions of the Plan.

In May of 2000, the nature and extent of Ms. Krauss's philanthropy became known to her intended beneficiaries. Citing BRMC's bankruptcy, First Lutheran and the Mother Church filed a complaint against the trustees and L-BRMC in the probate court seeking to prohibit any distribution from the trust corpus to the bankrupt hospital. L-BRMC objected on several grounds, asserting

---

[1]BRMC and L-BRMC are not distinct legal entities. Rather, L-BRMC is the continuation of BRMC as reorganized. We distinguish between them solely for purposes of clarity.

in the first instance that the injunctive provisions of the Plan barred the maintenance of the suit.[2]  The churches agreed to drop L-BRMC from the state court proceeding and filed a motion in the bankruptcy court for relief from the injunction so that the probate court proceeding could go forward.  The bankruptcy court denied that motion on July 12, 2000.

Shortly thereafter, L-BRMC initiated an adversary proceeding in the bankruptcy court to compel the trustees to turn over the hospital's share of the trust assets.  The churches intervened and counterclaimed for reformation of the indentures of trust, seeking to reimpose the "bed" limitation that had been contained in Ms. Krauss's will.  First Lutheran simultaneously moved to dismiss the turnover complaint and the Mother Church filed a motion entreating the bankruptcy court to abstain.  The bankruptcy court denied both of these motions.  In re Boston Reg'l Med. Ctr., 265 B.R. 645, 651-52 (Bankr. D. Mass. 2001) (BRMC I).  Although it agreed that the adversary proceeding was not

---

[2]The Plan provides in pertinent part:

[T]he confirmation of the Plan shall act to permanently enjoin . . . all persons . . . (a) from commencing or continuing in any manner any action or other proceeding of any kind with respect to any such claim or interest against the Debtor and/or reorganized BRMC; . . . (c) from creating, perfecting or enforcing any encumbrance of any kind against reorganized BRMC, or against the property of the reorganized BRMC with respect to any such claim or interest; . . . . (excess capitalization omitted).

appropriately characterized as a turnover action (and, thus, was not a core proceeding), the court nevertheless found "related to" jurisdiction under 28 U.S.C. § 1334(b) (2000), id. at 651, and determined that abstention would be inappropriate, id. at 652.

On February 7, 2003, the bankruptcy court held a hearing on the merits. It thereafter concluded that because Ms. Krauss died before BRMC ceased to function as a hospital and because BRMC incurred its debts in furtherance of its charitable mission, there was no obstacle to paying out a one-third share of the trust residue. In re Boston Reg'l Med. Ctr., 298 B.R. 1, 27-30 (Bankr. D. Mass. 2003) (BRMC II). The court further determined that the churches' counterclaim was barred by the doctrine of res judicata. Id. at 18-23. Based on these findings and conclusions, the bankruptcy court recommended that the district court enter an order directing the trustees to pay the disputed funds to L-BRMC.

The churches filed objections to the bankruptcy court's recommended decision. See 28 U.S.C. § 157(c)(1) (2000); Fed. R. Bankr. P. 9033(b). They also moved in the district court for (i) dismissal for want of subject matter jurisdiction, (ii) abstention, or (iii) certification of the state law questions to the Massachusetts Supreme Judicial Court (SJC). The district court denied the motions, conducted a de novo review of the record, adopted the bankruptcy court's proposed findings and conclusions with minor modifications, and entered judgment accordingly. In re

<u>Boston Reg'l Med. Ctr.</u>, No. Civ. A. 03-12215, 2004 WL 1778881, at *6 (D. Mass. Aug. 9, 2004) (<u>BRMC III</u>).  The churches now appeal.

## II.  JURISDICTION

We start with the jurisdictional question.  The churches strive to persuade us that there is no "related to" jurisdiction because this litigation arose after the bankruptcy court confirmed the Plan.  We are not convinced.

Bankruptcy jurisdiction is governed principally by statute.  The general grant of bankruptcy jurisdiction is contained in 28 U.S.C. § 1334.  That provision vests original jurisdiction in the district courts over "all civil proceedings arising under title 11, or arising in or related to cases under title 11."  <u>Id.</u> § 1334(b).  In what is a typical arrangement, the District of Massachusetts, by standing order, has delegated to the bankruptcy court all cases in which jurisdiction is premised on section 1334, <u>see</u> D. Mass. R. 201, subject to review by the district court (or, alternatively, by the bankruptcy appellate panel) in accordance with 28 U.S.C. §§ 157, 158.

The statutory grant of "related to" jurisdiction is quite broad.  Congress deliberately allowed the cession of wide-ranging jurisdiction to the bankruptcy courts to enable them to deal efficiently and effectively with the entire universe of matters connected with bankruptcy estates.  <u>See</u> <u>Pacor, Inc.</u> v. <u>Higgins</u>, 743 F.2d 984, 994 (3d Cir. 1984).  Thus, bankruptcy courts ordinarily

-8-

may exercise related to jurisdiction as long as the outcome of the litigation "potentially [could] have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate." In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991) (quoting In re Smith, 866 F.2d 576, 580 (3d Cir. 1989)).

In this instance, the bankruptcy court found the adversary proceeding to be "related to [a] case[] under title 11," as that phrase is used in section 1334(b). At first blush, this seems to be a garden-variety application of the general rule. Whether or not BRMC prevails will directly affect the amount of the liquidating dividend paid to creditors. There is, therefore, a fairly close connection between the adversary proceeding and the administration of the bankruptcy estate. That seemingly would suffice to bring this case within the bankruptcy court's related to jurisdiction. See In re Toledo, 170 F.3d 1340, 1345-46 (11th Cir. 1999) (finding related to jurisdiction when the outcome of the suit would affect the amount of funds available to creditors).

The churches urge us not to apply the general rule here. In their view, the distinguishing feature is that L-BRMC commenced this proceeding after the bankruptcy court confirmed the Plan. This argument presupposes that the scope of the bankruptcy court's related to jurisdiction narrows dramatically once a plan of

-9-

reorganization has been confirmed and that, thereafter, related to jurisdiction only includes those matters that have a particularly close nexus to the confirmed plan — a nexus that the churches assert is absent in this case.

On its face, section 1334 does not distinguish between pre-confirmation and post-confirmation jurisdiction. Nonetheless, courts sometimes have found a need to curtail the reach of related to jurisdiction in the post-confirmation context so that bankruptcy court jurisdiction does not continue indefinitely. See, e.g., In re Pegasus Gold Corp., 394 F.3d 1189, 1193-94 (9th Cir. 2005) (suggesting that post-confirmation bankruptcy court jurisdiction is necessarily more limited than pre-confirmation jurisdiction); In re Resorts Int'l, Inc., 372 F.3d 154, 164-69 (3d Cir. 2004) (similar).

The rationale behind this line of decisions starts with the premise that a reorganized debtor is emancipated by the confirmation of a reorganization plan. It emerges from bankruptcy and enters the marketplace in its reincarnated form. From that point forward, it is just like any other corporation; "it must protect its interests in the way provided by the applicable non-bankruptcy law," without any special swaddling. Pettibone Corp. v. Easley, 935 F.2d 120, 122-23 (7th Cir. 1991). Given the broad sweep of related to jurisdiction, applying the general rule without qualification after the confirmation of a reorganization plan easily could result in the bankruptcy court retaining jurisdiction

-10-

of all cases affecting the reorganized debtor for many years thereafter. This prospect not only would work an unwarranted expansion of federal court jurisdiction but also would unfairly advantage reorganized debtors by allowing such firms to funnel virtually all litigation affecting them into a single federal forum. See id. at 122.

The solution, however, is not to discard the baby with the bath water. While courts have interpreted the term "related to" more grudgingly in some post-confirmation settings, context is important. Those narrowing interpretations have been invoked only with respect to actions involving reorganized debtors that have reentered the marketplace. No case has suggested that courts should abandon the general rule in all post-confirmation cases.

Here, the Plan calls for the liquidation of BRMC, not its continuation as a going concern. The most salient difference between the usual Chapter 11 reorganization and a liquidating plan is that, in the latter instance, the reorganized debtor's sole purpose is to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend. By definition, it has no authority to reenter the marketplace. That fact undercuts the primary purposes for parsimoniously policing the perimeter of post-confirmation jurisdiction: the specter of endless bankruptcy jurisdiction and a kindred concern about unfairly advantaging reorganized debtors. Accordingly, there is much less reason to

depart from the general rule for related to jurisdiction where a claim involves a liquidating plan of reorganization.

There is another, perhaps more important, reason for distinguishing between liquidating plans and true reorganization plans. Courts that have limited the scope of post-confirmation jurisdiction have based their holdings on the conclusion that, once confirmation has occurred, fewer proceedings are actually related to the underlying bankruptcy case. See, e.g., Resorts Int'l, 372 F.3d at 165-67; In re Craig's Stores of Tex., Inc., 266 F.3d 388, 390 (5th Cir. 2001). That makes good sense: as the corporation moves on, the connection attenuates.

This justification is absent in the case of a liquidating plan. Typically, a reorganized debtor is attempting to make a go of its business. Thus, its actions (including any involvement in litigation) redound primarily to that end and only affect the underlying bankruptcy proceeding in a tangential or derivative way. See Pettibone, 935 F.2d at 122-23. By contrast, a liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court. Any litigation involving such a debtor thus relates much more directly to a proceeding under title 11.

This case is a paradigmatic example: L-BRMC's success or lack of success in securing a share of the trust corpus will directly impact the amount of the liquidating dividend eventually

paid to BRMC's creditors.  That is a matter intimately connected with the efficacy of the bankruptcy proceeding.[3]

We add, moreover, that in the case of a liquidating plan of reorganization, there exists a substantial policy interest in favor of adhering to the general rule governing related to jurisdiction:  the strong federal policy in favor of the expeditious liquidation of debtor corporations and the prompt distribution of available assets to creditors.  See In re Holiday Mart, Inc., 715 F.2d 430, 435 (9th Cir. 1983); In re Cartridge Television, Inc., 535 F.2d 1388, 1390 (2d Cir. 1976).  This policy is furthered by concentrating in a single forum any litigation that will impede or advance that goal.

The existence vel non of related to jurisdiction must be determined case-by-case.  See Pegasus Gold, 394 F.3d at 1194 (recognizing that post-confirmation related to jurisdiction should be determined with "a certain flexibility").  The language of the jurisdictional statute, 28 U.S.C. § 1334, is protean, and what is "related to" a proceeding under title 11 in one context may be unrelated in another.  With this in mind, we feel confident that there will be situations in which the fact that particular

---

[3]Although there is authority for the proposition that the prospect of increasing the funds available to creditors, without more, is insufficient to establish related to jurisdiction in a post-confirmation case, see, e.g., Craig's Stores, 266 F.3d at 391, those cases concern operating corporations, not liquidating corporations.  They are, therefore, inapposite.

litigation arises after confirmation of a reorganization plan will defeat an attempted exercise of bankruptcy jurisdiction. See, e.g., Resorts Int'l, 372 F.3d at 166-68. We are equally confident, however, that there are other situations in which the fact that particular litigation arises after confirmation of a reorganization plan will not defeat an attempted exercise of bankruptcy jurisdiction.

Insofar as we can tell, no court has yet addressed the scope of post-confirmation related to jurisdiction in a case involving a liquidating plan of reorganization. For the reasons alluded to above, we hold that when a debtor (or a trustee acting to the debtor's behoof) commences litigation designed to marshal the debtor's assets for the benefit of its creditors pursuant to a liquidating plan of reorganization, the compass of related to jurisdiction persists undiminished after plan confirmation. Based on this holding, we affirm the bankruptcy court's exercise of subject matter jurisdiction.

## III.  THE MERITS

We turn now to the merits. In this court, the churches have abandoned their counterclaim for reformation of the trust indentures. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that legal points alluded to in a perfunctory manner, but unaccompanied by developed argumentation, are deemed abandoned). Instead, they focus on their thesis that L-BRMC is

-14-

ineligible to receive a share of the trust residue.  This thesis runs as follows.  Under Massachusetts law, an organization is only eligible to receive a charitable bequest if it is capable of using the bequest for the purpose for which it was intended[4] — and an entity that exists solely for the benefit of creditors (like L-BRMC) is incapable of using such a bequest (like Ms. Krauss's) for the intended purpose ("provid[ing] a bed for indigent patients").

Like the district court, we review de novo the bankruptcy court's conclusions of law.  In re Mailman Steam Carpet Cleaning Corp., 212 F.3d 632, 636 (1st Cir. 2000).  We review its findings of fact, as modified by the district court, for clear error.  Id. Inasmuch as the parties and the courts below have addressed this case on the plausible assumption that Massachusetts law furnishes the substantive rules of decision, we follow suit.  See In re Newport Plaza Assocs., 985 F.2d 640, 643-44 (1st Cir. 1993); see also Ungar v. PLO, 402 F.3d 274, 283-84 (1st Cir. 2005).

Massachusetts law on certain issues central to this appeal is fuliginous.  We are therefore required to make an informed prophecy as to how the SJC would rule if confronted with

---

[4]L-BRMC asserts rights both as a legatee under Ms. Krauss's will and as a beneficiary under the inter vivos trusts established on her behalf.  Depending on which instrument is under consideration, Ms. Krauss technically may be a testator or a settlor and her largesse technically may be described either as a bequest or as a distribution.  Since the parties' rights are the same in either event, we refer throughout to Ms. Krauss as the testator and to the gift as a bequest.

the same questions.  Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996).  In making this prediction, we rely first on settled Massachusetts law and build from there by reference to case law in other jurisdictions[5] and to the policies enunciated in the Massachusetts cases.  See Moores v. Greenburg, 834 F.2d 1105, 1107 (1st Cir. 1987); Murphy v. Erwin-Wasey, Inc., 460 F.2d 661, 663 (1st Cir. 1972).  We are entitled to assume that the highest court of the state would apply the rule that would best implement those policies.  Kathios v. Gen. Motors Corp., 862 F.2d 944, 949-50 (1st Cir. 1988); Moores, 834 F.2d at 1107.

We begin with what can be gleaned from the Massachusetts cases.  In construing a will or other testamentary instrument, the testator's intent governs.  Clymer v. Mayo, 473 N.E.2d 1084, 1094 (Mass. 1985).  Charitable gifts are impressed with a kind of quasi-trust, which demands that they be applied to charitable purposes. See Hillman v. Roman Catholic Bishop of Fall River, 508 N.E.2d 118, 119 n.3 (Mass. App. Ct. 1987) ("A gift with a general charitable intent, of course, imposes a trust of a sort in the sense that the grantee may not use the assets for private, personal purposes; the assets must be used for charitable purposes consistent with those of the designated charity."); see also Brigham v. Peter Brent Brigham Hosp., 134 F. 513, 517 (1st Cir. 1904) (describing this

_____

[5]Here, the authorities are divided and are thus of little help.

-16-

phenomenon, under Massachusetts law, as "a quasi trust" not "a true trust"); Smith v. Livermore, 10 N.E.2d 117, 125 (Mass. 1937) (stating that gifts to charitable corporations in Massachusetts are considered gifts upon trust for charitable purposes).

In Massachusetts, an organization that is the beneficiary of a charitable bequest is not disqualified from receiving the bequest merely because it has merged with another charity or has ceased actively to provide charitable services. See Old Colony Trust Co. v. Winchester Home for Aged Women, 85 N.E.2d 622, 623-24 (Mass. 1949); Old Colony Trust Co. v. Third Universalist Soc'y of Cambridge, 188 N.E. 711, 711-12 (Mass. 1934); Boston Safe Deposit & Trust Co. v. Stratton, 156 N.E. 885, 888-89 (Mass. 1927). In each of these cases, however, the beneficiary, though no longer itself providing charitable services, had the capacity to redirect its funds to another organization that was actively engaged in charitable endeavors. See, e.g., Winchester Home, 85 N.E.2d at 623 (noting that although the named beneficiary itself no longer functioned as a home for elderly women, it continued to exist as a corporation and to use its resources to support a comparable facility in the same community).

This distinction seems to have driven the SJC's decision in Sleeper v. Camp Menotomy, 223 N.E.2d 696 (Mass. 1967). There, a testator left a bequest to the Arlington Girl Scouts (AGS). Id. at 696. Before the testator's death, the corporation that

previously had operated as AGS disaffiliated with the Girl Scouts and went forward as the same corporate entity, albeit under the new name Camp Menotomy. Id. at 697. As such, it ran a nonprofit summer camp for girls. Id. The SJC held that the corporation was ineligible to receive the bequest because it no longer had any involvement in the scouting movement. Id. at 697-98.

Massachusetts law thus appears to require that a donee of a charitable bequest be able and willing, at a bare minimum, to direct the funds received to charitable purposes of the same general type and kind that it historically had performed. Failing that, the courts will appoint a trustee to effectuate the testator's charitable intent. See Hubbard v. Worcester Art Museum, 80 N.E. 490, 494 (Mass. 1907) (explaining that "[i]f the corporation, at the time of the probate of the will, was incapable of taking the property and carrying out the general charitable intent of the testator, the court . . . would appoint a trustee to act in its place"); Bliss v. Am. Bible Soc'y, 84 Mass. 334, 336-37 (1861) (similar).

We conclude, therefore, that the Massachusetts cases point strongly to a rule that an organization cannot receive a charitable bequest unless it is both capable of using that bequest for the intended purpose and willing to do so. Against this backdrop, we must decide whether the bequest to BRMC was intended

-18-

for a charitable purpose and, if so, whether BRMC had the capacity to carry out that purpose at the critical time.

Under Massachusetts law, a gift to a charitable organization is ordinarily construed as a gift for a charitable purpose. See Wellesley Coll. v. Att'y Gen., 49 N.E.2d 220, 223 (Mass. 1943); Osgood v. Rogers, 71 N.E. 306, 308 (Mass. 1904). There is no dispute that both at the time Ms. Krauss executed her will and at the time the probate court sanctioned the proposed trusts, BRMC was a nonprofit corporation, duly qualified under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), and, thus, a charitable organization. Against this backdrop, we readily conclude that Ms. Krauss intended the bequest to be used for a charitable purpose. The will's explicit reference to "a bed for indigent patients" makes this clear, as does the trust article naming BRMC as a beneficiary (which states that the residue of the trust shall be distributed "in equal shares to such of the following charitable organizations" so long as each organization then qualifies as a charity under the Internal Revenue Code).

Viewed in this light, the question reduces to whether BRMC, in its new incarnation as a corporation whose sole purpose is to marshal its assets, liquidate them, and distribute the proceeds to creditors, is eligible to receive a charitable bequest. On this issue, the Massachusetts cases are silent and the authorities

-19-

elsewhere are divided.  Compare, e.g., In re Will of Kraetzer, 462 N.Y.S.2d 1009, 1012-13 (Sur. Ct. 1983) (holding that a bankrupt hospital is not capable of implementing the purpose of a charitable bequest and that the hospital is therefore ineligible to receive the bequest), with, e.g., Montclair Nat'l Bank & Trust Co. v. Seton Hall Coll. of Med. & Dentistry, 233 A.2d 195, 200 (N.J. Super. Ct. App. Div. 1967) (concluding otherwise on the ground that the payment of debts incurred in the furtherance of charitable purposes is itself a charitable purpose).

We navigate through these uncharted waters by following a pole star of Massachusetts law:  the principle that, in construing testamentary instruments, courts, whenever possible, should give full effect to the testator's intent. See Clymer, 473 N.E.2d at 1094.  The language that Ms. Krauss used in her will offers a window into her intent:  she was concerned about helping sick persons who could not afford to pay for health care.  That is a fairly typical species of charitable intent; a charitable act generally is thought to be an act of benevolence or generosity toward others, in particular the needy. See W. Mass. Lifecare Corp. v. Bd. of Assessors, 747 N.E.2d 97, 103 (Mass. 2001); Saltonstall v. Sanders, 93 Mass. 446, 469 (1865).

Normally, a testator who leaves a charitable bequest acts with a prospective intention. See Will of Kraetzer, 462 N.Y.S.2d at 1013.  She intends that the bequest will increase the charity's

good works by helping it to continue furnishing services, to expand service delivery, or the like. We find it difficult to imagine that, in the absence of special circumstances, a person with a generic charitable intent would choose to subsidize a charitable organization if she knew that the funds would be used only to pay creditors and not to assist in providing any future or additional charitable services.[6]

The bankruptcy court thought that since BRMC incurred its debts in the furtherance of its charitable mission, the payment of those debts could be deemed charitable in nature. BRMC II, 298 B.R. at 28-30. That reasoning has some superficial appeal: it would have been impossible for BRMC to function effectively as a hospital without credit and in that sense the provision of credit was vital to its ability to discharge its charitable function. In the usual case, however, the extension of credit is not itself an act of charity, and in a real-world sense, the payment of debts after a hospital ceases operations does not further the hospital's ability to carry out its charitable mission. For that reason, we think it would be inconsistent with Ms. Krauss's intent for a dead-as-a-doornail hospital to receive a portion of the trust corpus

_____

[6]Of course, a testator might leave a bequest for the specific purpose of enabling a charitable organization, whether or not solvent, to pay its debts. That sort of bequest is beyond the scope of this opinion.

-21-

with the understanding that it would be spent solely to reimburse creditors for debts previously incurred.

We are also unpersuaded that holding a bankrupt hospital incapable of taking a charitable bequest will have the dire consequences predicted by the appellees. While a rule that charitable bequests could not be used to pay debts might have a crippling effect on a charity's ability to obtain credit and, hence, on its ability to function, our holding is not nearly so broad. We decide only that, absent a contrary provision in the will or indenture of trust, a charitable organization that has ceased to perform any charitable work and that is incapable of redirecting new funds for charitable purposes is ineligible to receive a charitable bequest or gift. That rule will have the effect, in a few cases, of blocking a charity's creditors from access to a new source of funds — but that is a small price to pay for honoring the testator's intent.[7]

This decision does not end our odyssey. We still must consider the significance (if any) of the time lapse between the testator's death and the ensuing bankruptcy. When Ms. Krauss died, BRMC was running a fully functioning hospital and was actively

_____

[7]Our emphasis on the testator's intent is buttressed by our knowledge that, under Massachusetts law, a testator could expressly include a provision in her will precluding a bankrupt charity from taking thereunder. See Springfield Safe Deposit & Trust Co. v. Friele, 23 N.E.2d 138, 141 (Mass. 1939) (holding that a testator is generally entitled to place such conditions and limitations on a bequest as she sees fit).

engaged in performing its charitable mission. By any standard, it was then able to receive the bequest. The question is whether that datum makes a dispositive difference.

In the churches' view, this accident of timing is irrelevant. The only thing that matters is that BRMC is bankrupt now and no money it receives will be used for charitable purposes on a going-forward basis. BRMC has a different viewpoint; it asseverates that its rights to the bequest vested as of the date of Ms. Krauss's demise; that it was then eligible to receive the funds; and that subsequent events cannot defease that entitlement. Neither of these positions is foolproof.

On the one hand, the churches' proposed rule that a beneficiary's status at the time of distribution is the relevant benchmark seems as shaky as a shack built upon shifting sands. The Massachusetts cases offer no support for such a hard-and-fast rule; what little authority we have found points in the opposite direction. See, e.g., Hubbard, 80 N.E. at 494 (suggesting, in dictum, that the capacity to receive a charitable bequest should be judged at the time of probate of the will). Moreover, such a rule would have the potential to work serious mischief. If those in charge of the distribution of funds have the power, through action or inaction, to affect the identity of those who receive the funds, the risk of abuse might well be unacceptable. See Montclair, 233 A.2d at 199-200.

The churches' suggested rule also raises the boggart of unnecessary litigation aimed at influencing the timing of distributions. We think that the Massachusetts cases, to the extent they shed any light on this issue, exhibit a preference for a rule that is not contingent on the whims of third parties. See Sleeper, 223 N.E.2d at 697 (indicating that the eligibility of a charitable organization to receive a bequest ought to be determined at the time "the will became effective").

On the other hand, BRMC's position is also open to question. While Massachusetts law is clear that the bequest vested at Ms. Krauss's death, see Cook v. Hayward, 51 N.E. 1075, 1076 (Mass. 1898), vesting is a concept that has different shades of meaning in different contexts. For example, although non-contingent bequests vest at the time of the testator's death, a will may provide for a built-in delay in distribution (as in the case of an intervening life estate). See, e.g., Brigham, 134 F. at 518-19. In such cases, many years may pass before the beneficiary is entitled to a distribution.[8] Id.

---

[8]In the case of charities, a named beneficiary may become unable to carry out the charitable purpose of the bequest after the death of the testator but before it is eligible to receive the bequest under the will. In that scenario, the mere fact that the bequest vested might not be enough to entitle the beneficiary to payment. Cf. Stratton, 156 N.E. at 887-88 (discussing the eligibility of a charitable legatee to take under a will when the asserted disability accrued after the death of the testator, but during an intervening life estate). Since the case at bar involves an outright bequest, with no intervening life estate or other built-in reason for a delay in payment, we need not decide how the

-24-

One thing is certain: vesting notwithstanding, the bequest was not payable immediately upon Ms. Krauss's death. An unbroken skein of Massachusetts cases, dating back to the early nineteenth century, recognizes that time is needed for an estate to gather the testator's assets and settle any debts. See, e.g., Andrews v. Hunneman, 23 Mass. 126, 129-130 (1828). This consideration has particular force with respect to the payment of residual legacies, as debts, expenses, taxes, and other bequests all must be paid before the amount of the residue can be determined, let alone distributed. See Blaney v. Blaney, 55 Mass. 107, 115 (1848).

As a result, unless a will specifies some later date — and Ms. Krauss's will did not — Massachusetts courts hold that bequests are deemed payable one year after the death of the testator. See Porter v. Ketchum, 203 N.E.2d 84, 84 (Mass. 1964). Not coincidentally, this interval corresponds to Massachusetts's one-year period for filing claims against an estate. See Mass. Gen. Laws ch. 197, § 9. Although an executor, in his discretion, may pay a bequest before this prescriptive period expires, a suit to compel payment of a bequest will not lie until a year has passed. See Brooks v. Lynde, 89 Mass. 64, 67 (1863); see also Mass. Gen. Laws ch. 197, § 20 (providing that interest does not

rule would operate in such a configuration.

-25-

begin to accrue on legacies or bequests until after the limitations period for claims against the estate has expired).

In sum, the bequest to BRMC vested upon Ms. Krauss's death on March 1, 1998 (when BRMC was operating a hospital). However, BRMC had no right to demand payment of the bequest until March 1, 1999 (by which time it had entered bankruptcy and halted hospital operations). The crucial question, then, is which of these dates controls in determining BRMC's eligibility to receive the bequest.

Although the question is close, we conclude that the SJC would choose the date of vesting as the vantage point from which to determine a charitable organization's eligibility to receive a bequest. We reach this conclusion partially by analogy to the case of natural persons. The SJC has held that when a will contains a bequest that is contingent on the donee surviving the testator and the donee does survive but dies before distribution of the bequest, the donee's heirs (rather than the testator's heirs) are entitled to receive the bequest. Childs v. Russell, 52 Mass. 16, 25 (1846). This holding makes it transparently clear that, in the usual case, the Massachusetts courts measure a donee's eligibility to receive a bequest from the time of the testator's demise, notwithstanding the absence of a right to immediate possession. Given that the human mind cannot devise a rule that would apply perfectly in all circumstances, we believe that the SJC would hew to this same line

-26-

of reasoning in a case involving a charitable bequest to a charitable beneficiary.

We also give weight to the fact that a "date of vesting" rule is an easier one to administer. Although BRMC had no absolute right to receive its share of the trusts until a year after Ms. Krauss's death, the trustees had the authority to make such a distribution at an earlier date. Had they done so, we do not think anyone would suggest with a straight face that BRMC should be required to refund the bequest because it ceased operations before a full year had passed. Thus, measuring the organization's eligibility to receive the bequest as of the date when distribution could be mandated would reintroduce the prospect of manipulation on the part of the fiduciary and, thus, would wind up at cross purposes with the Massachusetts policy favoring mechanical rules in the distribution of estates.[9]

That ends this aspect of the matter. We conclude that the SJC would find it preferable to measure eligibility from the time of death. Thus, BRMC's right to the bequest was complete upon Ms. Krauss's death. As BRMC was a fully functioning hospital at that time, it was eligible to receive the bequest. The fact that its

---

[9]Of course, the "date of vesting" rule that we endorse today is a default rule. Within wide limits, a testator retains the ability to specify the terms on which a beneficiary is eligible to receive a bequest and, thus, to modify the "date of vesting" rule as he or she sees fit. See Springfield Safe Deposit & Trust Co. v. Friele, 23 N.E.2d 138, 141 (Mass. 1939).

continued existence as a hospital was short-lived did not alter that reality. Accordingly, as between these claimants, L-BRMC is entitled to the disputed funds.

## IV. RELIEF FROM THE INJUNCTION

One loose end remains. As a fallback position, the churches contend that even if we find L-BRMC eligible to receive the bequest — as we have — we nonetheless should reverse the lower courts' refusal to grant relief from the Plan's injunctive provisions, quoted supra note 2, so that the churches can initiate a proceeding in the Massachusetts probate court to conform the trusts to the will and reintroduce the "bed for indigent patients" limitation. BRMC argues that this is a non-issue because the earlier probate orders constitute a bar to further proceedings on res judicata grounds.

We need not reach the res judicata issue (and, consequently, do not attempt to resolve it). While the record does not reveal the bankruptcy court's reasons for denying relief from the injunction, the district court's opinion affords some guidance. In upholding the bankruptcy court's refusal to relax the injunction, that court cited the substantial delay in the liquidation of BRMC that this litigation already had caused and concluded that, in all events, any proceeding brought by the churches in the probate court likely would be a waste of time. BRMC III, 2004 WL 1778881, at *5-*6 & n.12.

Although the matter is far from clear, we assume, for argument's sake, that the probate court retains the authority, even at this late date, to modify its decree confirming Ms. Krauss's estate plan. Cf. O'Brien v. Dwight, 294 N.E.2d 363, 380-81 (Mass. 1973) (holding that probate courts have the continuing power to revoke or modify their decrees, but suggesting that such action would only be appropriate in limited circumstances). Even so, the mere fact that relief which is not available to a litigant in the bankruptcy court conceivably might be available in another forum is not, in and of itself, sufficient to require the bankruptcy court to lift an injunction or a stay. See, e.g., In re Federated Dep't Stores, Inc., 328 F.3d 829, 836-37 (6th Cir. 2003) (holding that the bankruptcy court acted within its discretion in refusing to relax an anti-suit injunction, even though the denial of relief might cause hardship to the movant's ability to litigate a state law claim). The bankruptcy court is entitled to consider not only the nature of the remedies that might be available in a parallel (non-bankruptcy) proceeding but also the substantiality of the asserted claim and the effect of granting the exception on the bankruptcy case as a whole. See In re Calore Express Co., 288 F.3d 22, 35-36 (1st Cir. 2002).

We review a bankruptcy court's decision not to exempt a particular claim from the sweep of an injunction or stay prohibiting the maintenance of non-bankruptcy litigation for abuse

of discretion.  In re C & S Grain Co., 47 F.3d 233, 238 (7th Cir. 1995).  Having reviewed the record with care, we discern no abuse of discretion here.  There are a series of obstacles standing in the churches' way.  First, we question whether the probate court would entertain the churches' belated petition to modify the estate plan.  Second, even if the probate court would entertain the petition, we view the chances of the churches winning reformation as small.  Third, even if the churches were to prevail in reforming the indentures of trust, it is problematic whether that victory would change the ultimate analysis vis-à-vis BRMC's entitlement to the bequest.  After all, at the time of Ms. Krauss's death, BRMC was functioning as a hospital and, thus, was still capable of applying the bequest to the care of indigent patients.  And, finally, even if the churches succeeded in stripping away BRMC's entitlement to the bequest, it is not certain that they would benefit.  Cf., e.g., Town of Brookline v. Barnes, 87 N.E.2d 843, 845-47 (Mass. 1949) (holding that a charitable gift, which could not be distributed because of the legatee's unwillingness to carry out the testator's charitable intent, could inspire an application of the doctrine of cy pres so that the court could order the bequest paid to a different institution and, thus, effectuate the testator's charitable intent).

     The bottom line, then, is that the churches' anticipated probate claim is tenuous at best.  That fact, coupled with the

district court's accurate observation that the battle for the bequest already has caused protracted delay in winding up the bankruptcy case, convinces us that the refusal to lift the injunction was comfortably within the encincture of the lower courts' discretion.

## V. CONCLUSION

We need go no further. In life, timing often is important. So it is here: on the date of the testator's death, BRMC was eligible to receive the charitable bequest because it was then operating a nonprofit hospital. Our conclusion that the date of death (and, hence, the date of vesting) controls may in some sense seem arbitrary (after all, a few months either way would have made a dispositive difference). But there are no perfect solutions to imbricated problems of this sort. Thus, we base our conclusion not on its inevitability, but, rather, on our belief that the SJC, if squarely confronted with this conundrum, would hold that the relevant date for determining the capacity of a beneficiary to take a charitable bequest is the vesting date, regardless of whether the distribution is made on that date or at some later time. In our view, this result represents a reasonable accommodation of competing centrifugal and centripetal forces, most particularly, Massachusetts's policy favoring the preservation of charitable gifts for charitable purposes and Massachusetts's expressed

preference for mechanical rules of descent and distribution in matters of testamentary distribution.

**Affirmed**.